331 F.3d 1094
 In re INDIAN GAMING RELATED CASES.
Chemehuevi Indian Tribe; Elk Valley Rancheria; Hoopa Valley Indian Tribe; Hopland Band of Pomo Indians; Redding Rancheria; Smith River Rancheria, Plaintiffs, and
Coyote Valley Band of Pomo Indians, Plaintiff-Appellant,
v.
The State of California, Defendant-Appellee.
 No. 01-16283.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 3, 2002.
 Filed June 11, 2003.
 
 Eduardo G. Roy, San Francisco, California, for the appellant.
 Sara J. Drake, Marc A. Le Forestier, and Christine Murphy, Office of the Attorney General, Sacramento, California, for the appellee.
 Appeal from the United States District Court for the Northern District of California; Claudia Wilken, District Judge, Presiding. D.C. No. CV-98-01806-CW.
 Before: BRIGHT,* HAWKINS and FLETCHER, Circuit Judges.
 OPINION
 WILLIAM A. FLETCHER, Circuit Judge.
 
 
 1
 The Coyote Valley Band of Pomo Indians ("Coyote Valley") contends that the State of California ("the State") has refused to negotiate in good faith with the tribe to conclude a Tribal-State compact, as required by the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2710(d)(3)(A), and moved in the district court for an order that would require it to do so, 25 U.S.C. § 2710(d)(7)(B)(iii). In a carefully considered decision, the district court denied the motion and entered judgment for the State. We agree with the district court that the State has negotiated in good faith within the meaning of IGRA. We therefore AFFIRM.
 
 I. Background
 
 2
 The historical background against which Coyote Valley and the State negotiated is important to an understanding of this case. We begin with the events leading up to the Supreme Court's landmark decision in California v. Cabazon Band of Mission Indians, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). In the 1970s, some California tribes began to operate bingo halls on their lands as a way to generate revenue. "Such activities were controversial because the tribes generally refused to comply with state gambling laws, a situation that developed into a serious point of contention with [the] state government[]." Flynt v. California Gambling Control Comm'n, 104 Cal.App.4th 1125, 1132, 129 Cal.Rptr.2d 167 (2002). The State responded by attempting to enforce Cal.Penal Code § 326.5 (the "bingo statute") against these tribes. See Cabazon, 480 U.S. at 205, 107 S.Ct. 1083. California's bingo statute did not entirely prohibit bingo operations within the State, but it permitted only certain entities to run such operations and imposed various other requirements. See id. at 205, 209, 107 S.Ct. 1083. The Cabazon and Morongo Bands of Mission Indians, who were operating bingo halls on their reservations in Riverside County, California, contended that the State lacked authority to enforce the statute against Indian tribes. See id. at 206, 107 S.Ct. 1083.
 
 
 3
 In response, the State contended that Congress had expressly consented to its exercise of jurisdiction over tribal bingo by passing Public Law 280, 18 U.S.C. § 1162. See Cabazon, 480 U.S. at 206, 107 S.Ct. 1083. Public Law 280, originally enacted in the 1950s, "granted California and certain other states jurisdiction over criminal violations and civil causes of action on Indian reservations," but "left civil regulatory jurisdiction in the hands of the Tribes." Sycuan Band of Mission Indians v. Roache, 54 F.3d 535, 539 (9th Cir.1994); see also Cabazon, 480 U.S. at 208, 107 S.Ct. 1083 ("[A] grant to States of general civil regulatory power over Indian reservations would result in the destruction of tribal institutions and values."). The State contended that because a violation of the bingo statute constituted a criminal misdemeanor under California law, Public Law 280 permitted its enforcement on tribal lands. Cabazon, 480 U.S. at 209, 107 S.Ct. 1083.
 
 
 4
 In 1987 in Cabazon, the Supreme Court ruled in favor of the tribes, adopting a distinction originally drawn by this court between "criminal/prohibitory" and "civil/regulatory" state laws:
 
 
 5
 [I]f the intent of a state law is generally to prohibit certain conduct, it falls within Pub.L. 280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation.
 
 
 6
 Id. Because California permitted "a substantial amount of gambling activities, including bingo, and actually promote[d] gambling through its state lottery," the Court concluded that the State "regulate[d] rather than prohibit[ed] gambling in general and bingo in particular." Id. at 211, 107 S.Ct. 1083. Because there were no exceptional circumstances that warranted the assertion of State jurisdiction over tribal bingo operations, the Court held that the State lacked authority under Public Law 280 to enforce the bingo statute on Indian lands. Id. at 221-22, 107 S.Ct. 1083.
 
 
 7
 After the Court's decision in Cabazon, States sought recourse on Capitol Hill. Congress passed IGRA the next year, in 1988. As Judge Levi has recently written:
 
 
 8
 IGRA was Congress' compromise solution to the difficult questions involving Indian gaming. The Act was passed in order to provide "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and "to shield [tribal gaming] from organized crime and other corrupting influences to ensure that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. § 2701(1), (2). IGRA is an example of "cooperative federalism" in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme.
 
 
 9
 Artichoke Joe's v. Norton, 216 F.Supp.2d 1084, 1092 (2002) (alteration in original).
 
 
 10
 IGRA creates three classes of gaming, each subject to a different level of regulation. Class I gaming includes "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as part of, or in connection with, tribal ceremonies or celebrations," 25 U.S.C. § 2703(6), and its regulation is left exclusively within the jurisdiction of the Indian tribes, id. § 2710(a)(1). Class II gaming includes bingo, id. § 2703(7)(A)(i), and certain card games, id. § 2703(7)(A)(ii), but excludes any banked card games, electronic games of chance, and slot machines, id. § 2703(7)(B).[1] The regulation of class II gaming is also left within the jurisdiction of the tribes, but is subject to federal-state regulation as set forth in IGRA. Id. § 2710(a)(2); see, e.g., id. § 2710(b)-(c). Class III gaming, at issue in this case, includes "all forms of gaming that are not class I gaming or class II gaming," 25 U.S.C. § 2703(8); in short, it includes the types of high-stakes games usually associated with Nevada-style gambling. Class III gaming is subject to a greater degree of federal-state regulation than either class I or class II gaming.
 
 
 11
 Given that class III gaming can be "a source of substantial revenue for the Indian tribes and a significant rival for traditional private sector gaming facilities," its regulation "has been the most controversial part of [] IGRA and the subject of considerable litigation between various Indian tribes and the states." Flynt, 104 Cal.App.4th at 1134, 129 Cal.Rptr.2d 167; see also Hotel Employees & Rest. Employees Int'l Union v. Davis (Hotel Employees), 21 Cal.4th 585, 596, 88 Cal.Rptr.2d 56, 981 P.2d 990 (1999). IGRA makes class III gaming lawful on Indian lands only if such activities are: (1) authorized by an ordinance or resolution adopted by the governing body of the Indian tribe and the Chairman of the National Indian Gaming Commission;[2] (2) located in a State that permits such gaming for any purpose by any person, organization, or entity; and (3) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State and approved by the Secretary of the Interior. 25 U.S.C. § 2710(d)(1), (3)(B).
 
 
 12
 IGRA's compact requirement grants States the right to negotiate with tribes located within their borders regarding aspects of class III tribal gaming that might affect legitimate State interests. See id. § 2710(d)(3)(C); Kevin K. Washburn, Recurring Problems in Indian Gaming, 1 WYO. L. REV. 427, 429 (2001) ("In contrast to Class II gaming, Congress realized that. states were likely to have more serious and more legitimate public policy concerns related to more expansive casino type gaming which is defined as `Class III' gaming in IGRA. Accordingly, ... Congress limited Class III gaming to those states that already allow some measure of Class III gaming and gave states a voice in tribal decisions to conduct such gaming."). IGRA also imposes a concomitant obligation upon States to conduct those negotiations in good faith, 25 U.S.C. § 2710(d)(3)(A), and grants tribes the right to enforce that obligation by way of federal suit, id. § 2710(d)(7)(A).
 
 
 13
 IGRA provides that if no compact has been entered 180 days after an Indian tribe has requested that the State enter into compact negotiations, the tribe may bring suit in federal court. Id. § 2710(d)(7)(A)(i), (B)(i). If the court concludes that the State has failed to conduct negotiations in good faith, it shall order the State and the tribe to conclude a compact within a 60-day period. Id. § 2710(d)(7)(B)(iii). If the tribe and the State fail to do so, they must each submit to a court-appointed mediator a proposed compact representing their last best offer. Id. § 2710(d)(7)(B)(iv). The mediator will choose between the two proposed compacts the one that best comports with the terms of IGRA. Id. § 2710(d)(7)(B)(iv)-(v). If the State does not accept the mediator's chosen compact within 60 days, the Secretary of the Interior shall prescribe, consistent with the mediator's chosen compact and with the terms of IGRA, the conditions upon which the tribe may engage in class III gaming. Id. § 2710(d)(7)(B)(vii).[3]
 
 
 14
 The passage of IGRA did not end the fight over Indian gaming in California. After the statute's enactment, certain California tribes (including Coyote Valley) sought to negotiate compacts with the State permitting the operation of class III games on their respective reservations.[4] Flynt, 104 Cal.App.4th at 1136, 129 Cal. Rptr.2d 167. Among the class III games over which these tribes sought to negotiate were live banked or percentage card games and stand-alone electronic gaming machines (similar to slot machines). Rumsey Indian Rancheria of Wintun Indians v. Wilson, 64 F.3d 1250, 1255 (9th Cir. 1994), amended by 99 F.3d 321 (9th Cir. 1996). These particular games were not permitted under California law, see Cal.Penal Code §§ 330, 330a, 330b, but the State did allow other forms of class III gaming, such as non-electronic keno and lotto. Rumsey, 64 F.3d at 1255.
 
 
 15
 During the Administration of Governor Pete Wilson, the State refused to negotiate with the tribes with respect to the class III games they sought to conduct. It took the position that it had no obligation to do so, pointing to 25 U.S.C. § 2710(d)(1)(B), which provides that "class III gaming shall be lawful on Indian lands only if such activities are ... located in a State that permits such gaming for any purpose by any person, organization, or entity...." (Emphasis added.) In the State's view, because it did not permit live banked or percentage card games or slot machine-like devices, it had no duty to negotiate with respect to them. Rumsey, 64 F.3d at 1256.
 
 
 16
 The tribes argued that the phrase "such gaming" in § 2710(d)(1)(B) refers to class III gaming in general, rather than specific class III games in particular. In the tribes' view, because the State permitted other types of class III games, it could not refuse to negotiate over the subset of class III games that they sought to conduct. See Mashantucket Pequot Tribe v. Connecticut, 913 F.2d 1024, 1030 (2d Cir.1990) (agreeing with the tribes' position); Washburn, 1 WYO. L. REV. at 442 ("[T]he language can plainly be interpreted to indicate that if a state allows any Class III gaming activities, IGRA requires states to negotiate with tribes generally about Class III games and does not necessarily limit the negotiations to the particular Class III games that are offered under state law. Under this reading, the language constitutes an adoption of the criminal prohibitory versus civil-regulatory distinction set forth in Cabazon.").
 
 
 17
 We rejected the tribes' construction of 25 U.S.C. § 2710(d)(1)(B) in 1994 in Rumsey. We held that IGRA does not require a state to negotiate over one form of Class III gaming simply because it has legalized another, albeit similar form of gaming. Instead, the statute says only that, if a state allows a gaming activity "for any purpose by any person, organization, or entity," then it also must allow Indian tribes to engage in that same activity. 25 U.S.C. § 2710(d)(1)(B). In other words, a state need only allow Indian tribes to operate games that others can operate, but need not give tribes what others cannot have.
 
 
 18
 64 F.3d at 1258. Accord Cheyenne River Sioux Tribe v. South Dakota, 3 F.3d 273, 279 (8th Cir.1993) ("The `such gaming' language of 25 U.S.C. § 2710(d)(1)(B) does not require the state to negotiate with respect to forms of gaming it does not presently permit."). Compare Mashantucket, 913 F.2d at 1029-32; Rumsey, 64 F.3d at 1252-55 (Canby, J., joined by Pregerson, J., Reinhardt, J., and Hawkins, J., dissenting from the denial of rehearing en banc).[5]
 
 
 19
 Our decision in Rumsey meant that the State had no obligation to negotiate with tribes over the most lucrative forms of class III gaming. The Wilson Administration also refused to negotiate compacts covering class III games that the State did permit, unless and until the tribe requesting such negotiations ceased engaging in unlawful class III gaming — i.e., class III gaming conducted in the absence of a valid Tribal-State compact as required by 25 U.S.C. § 2710(d)(1)(C).[6] See Hotel Employees, 21 Cal.4th at 597, 88 Cal.Rptr.2d 56, 981 P.2d 990 ("[A] number of the tribes commenced and continued class III gaming activities without tribal/state compacts; in response, Governor Wilson refused to negotiate further until they ceased such gaming activities."). Because IGRA grants the federal government exclusive jurisdiction to prosecute any violations of State gambling laws in Indian country, the State's refusal to engage in negotiations was one of the few forms of leverage it possessed to force tribes to comply with IGRA's compacting requirement. See Sycuan Band of Mission Indians, 54 F.3d at 538-40; 18 U.S.C. § 1166 (making "all State laws pertaining to the licensing, regulation, or prohibition of" class III gaming applicable in Indian country in the absence of a valid Tribal-State compact, but granting the federal government exclusive jurisdiction to prosecute violations). In light of the Supreme Court's ruling in Seminole Tribe, see supra note 5, the tribes could not challenge the legitimacy of this position under IGRA absent State consent to suit, and such consent was not forthcoming. (Governor Wilson did offer to waive the State's sovereign immunity to suits brought by tribes pursuant to IGRA, but only if and when he received written certification that the tribes had ceased all illegal class III gaming.)
 
 
 20
 Rather than give up the ongoing class III gaming operations on which many tribes had come to rely, the tribes went directly to the people of California.[7] A coalition of California tribes drafted and put on the November 1998 State ballot Proposition 5, a statutory initiative containing a model compact:
 
 
 21
 The proposition, which amended state law but not the State constitution, required the state to enter into a model "Tribal-State Gaming Compact" with Indian tribes to allow certain class III gambling activities, such as banked card games and slot machines. Proposition 5 obligated the governor to execute compacts as a ministerial act within 30 days after any federally recognized Indian tribe requested such an arrangement. Under the plan, the compacts were deemed approved if the governor took no action within 30 days.
 
 
 22
 Flynt, 104 Cal.App.4th at 1136, 129 Cal. Rptr.2d 167 (internal citations omitted). See generally Cal. Gov.Code §§ 98000-98012; Hotel Employees, 21 Cal.4th at 598-601, 88 Cal.Rptr.2d 56, 981 P.2d 990 (summarizing the provisions of Proposition 5).
 
 
 23
 Relevant to this appeal, Proposition 5's model compact created three funds to which compacting tribes would contribute a set percentage of their net wins from tribal gaming terminals: (1) a "Nongaming Tribal Assistance Fund," from which distributions were to be made to non-gaming tribes to fund social services; (2) a "Statewide Trust Fund," from which distributions were to be made to counties in California to supplement emergency medical care and to establish or supplement programs addressing compulsive and addictive gambling; and (3) a "Local Benefits Grant Fund," from which distributions were to be made to address the needs of the cities or counties within the boundaries of which tribal gaming facilities were located. See Cal. Gov.Code § 98004, Secs. 5.2., 5.3, 5.4. Under the terms of the model compact, the tribes' obligation to contribute to these funds was expressly conditional:
 
 
 24
 The parties acknowledge that the operation of Tribal gaming terminals authorized under this Gaming Compact is expected to occupy a unique place in gaming within the State that is material to the ability of the Tribe and other tribal governments operating under similar compacts to achieve the economic development and other goals intended by IGRA. The Tribe therefore agrees to make the contributions to the trust funds described in Sections 5.2, 5.3, and 5.4, only for as long as it and other tribes that have entered into Gaming Compacts are not deprived of that unique opportunity.
 
 
 25
 Id. at Sec. 5.1. In other words, the tribes' obligation to contribute to these funds lasted only so long as they maintained their monopoly in the State over the operation of slot machines. Proposition 5 also included an explicit waiver of the State's sovereign immunity to suits brought against it pursuant to IGRA. See Cal. Gov. Code § 98005 ("[T]he State of California also submits to the jurisdiction of the courts of the United States in any action brought against the state by any federally recognized California Indian tribe asserting any cause of action arising from the state's refusal to enter into negotiations with that tribe for the purpose of entering into a different Tribal-State compact pursuant to IGRA or to conduct those negotiations in good faith....").
 
 
 26
 Proposition 5 passed by a wide margin. Shortly after its passage, however, the Hotel Employees and Restaurant Employees International Union (the "Union") and others filed a petition for a writ of mandate in the California Supreme Court seeking to prevent the Governor from implementing Proposition 5 because, they argued, it violated Article IV, Section 19(e) of the California Constitution. Hotel Employees, 21 Cal.4th at 601, 88 Cal.Rptr.2d 56, 981 P.2d 990. Section 19(e), added to California's Constitution in 1984, provides that the "Legislature has no power to authorize, and shall prohibit casinos of the type currently operating in Nevada and New Jersey."[8]
 
 
 27
 The California Supreme Court stayed operation of Proposition 5 and ordered the State to show cause why the relief sought by the Union should not be granted. The Wilson Administration responded by filing a return supporting the Union's opposition to Proposition 5. Hotel Employees, 21 Cal.4th at 591, 88 Cal.Rptr.2d 56, 981 P.2d 990. When Governor Gray Davis took office in January 1999, however, his Administration withdrew the return of the outgoing Administration and substituted its own, which expressed neutrality as to the Union's suit. Id.
 
 
 28
 On August 23, 1999, the California Supreme Court held, in agreement with the Union, that the gaming rights conferred on tribes by Proposition 5 violated the California Constitution. Id. at 589, 88 Cal. Rptr.2d 56, 981 P.2d 990. "Because Proposition 5, a purely statutory measure, did not amend section 19(e) or any other part of the Constitution, and because in a conflict between statutory and constitutional law the Constitution must prevail," the court invalidated the proposition in its entirety, save the final sentence of Cal. Gov. Code § 98005, containing the State's consent to federal suits brought by California tribes pursuant to IGRA.[9] Id.
 
 
 29
 Before the California Supreme Court ruled in Hotel Employees, the new Davis Administration had sought to engage tribes in compact negotiations, despite its limited obligations under our decision in Rumsey. Among other things, Governor Davis was concerned about the effect an adverse decision in Hotel Employees could have on tribes then engaged in (and dependent on revenue from) unlawful class III gaming operations. Depending on the scope of the opinion, the decision could completely prohibit the State from entering compacts to legitimize that gaming, thus leaving these tribes vulnerable to federal prosecution.
 
 
 30
 In March 1999, Governor Davis appointed a Special Counsel for Tribal Affairs to lead the State's negotiating team, and on April 9th he met personally with tribal leaders to introduce his appointee. At that meeting, which was attended by a representative of Coyote Valley, the State's lead negotiator asked that the tribes organize themselves into one or more negotiating teams to provide structure to the compact discussions. The tribes agreed, and subsequently formed three groups: (1) the United Tribe Compact Steering Committee ("UTCSC"); (2) the Desert Six group; and (3) the Pala Tribe group. Coyote Valley joined the UTCSC negotiating group, but reserved its right to withdraw at any time.[10]
 
 
 31
 From April 9 until May 4, the State's Office of Tribal Affairs received formal requests from the tribes to enter compact negotiations. The State met for an initial round of negotiations with the Desert Six group on May 6, with the Pala Tribe group on May 7, and with the UTCSC on May 13. At the May 13 meeting, the UTCSC announced that the model compact contained in Proposition 5 would be its opening offer. The State explained that it, too, wished to stay as close to the text of Proposition 5 as possible, but identified what it believed to be a few key deficiencies in the Proposition 5 model compact. While the State expressed no interest in cutting back on either the types of games permitted under Proposition 5 or the number of gaming machines currently in operation on tribal lands, it wanted to prevent the expansion of tribal gaming beyond what it considered to be reasonable levels, something Proposition 5 itself did not do. The State also took the position that the negotiated compact should allow the State to spend any revenue-sharing dollars it received from the tribes as it saw fit, rather than earmark those dollars for specified uses as in Proposition 5's model compact.
 
 
 32
 The State also expressed a desire that any compact address casino worker's rights. While the Proposition 5 model compact included provisions addressing employee work-related injuries, disabilities, and unemployment, see Cal. Gov.Code § 98004, Sec. 10.1(f), it had no provision concerning collective bargaining rights of casino employees. The State suggested that the tribes work directly with union representatives to decide how they might meet the concerns of organized labor. The UTCSC indicated that it had a meeting scheduled with union representatives the following Wednesday, but expressed its reluctance to cede tribal sovereignty to the State on labor issues. The UTCSC also expressed its belief that labor relations might be an inappropriate topic for Tribal-State compact negotiations pursuant to IGRA.
 
 
 33
 At the conclusion of the May 13 meeting, the parties agreed that the State would promptly prepare and circulate a working draft model compact in the form of a redlined version of Proposition 5 and that the parties would then meet for a second round of negotiations to discuss the draft. The State circulated its draft on May 21, and a second round of negotiations was held with the Desert Six and Pala Tribe groups on May 25, and with the UTCSC on May 26. Over the course of the next month, the State received and reviewed written responses and counter-proposals submitted by the three tribal negotiating groups.
 
 
 34
 On June 17, the UTCSC sent the State a discussion draft of its own, also as a redlined version of Proposition 5. The State did not respond immediately, and on July 22 the UTCSC sent the State a letter expressing frustration with the pace of discussions and voicing its concern that a compact might not be concluded before the announcement of the Hotel Employees decision. In that letter, the UTCSC again expressed its belief that labor relations, a subject included in the State's discussion draft of May 21, was not a proper topic of compact negotiations pursuant to IGRA. The letter also stated that the UTCSC had learned that the State was "exploring the concept of an enormous revenue sharing requirement," and noted that "[u]nder IGRA, this clearly would be an impermissible tax on Tribal gaming operations." According to Coyote Valley, the State intentionally stalled talks during this period so as to force the tribes to meet with union representatives.
 
 
 35
 Negotiations commenced again at the end of August. Two significant events occurred at about this time. First, the California Supreme Court announced its decision in Hotel Employees. The State already had no obligation to conclude compacts with tribes permitting slot machines and banked card games, see Rumsey, 64 F.3d at 1258; the decision meant it now also lacked the authority to do so. To address this problem, the Davis Administration proposed an amendment to Section 19 of Article IV of the California Constitution that would exempt tribal gaming from the prohibition on Nevada-style casinos, effectively granting tribes a constitutionally protected monopoly on most types of class III games in California. Although the voters would not have the opportunity to ratify the proposed amendment ("Proposition 1A") until March of 2000, the parties nonetheless determined to keep working to conclude a Tribal-State compact that would be conditional on that ratification.[11] Second, the United States Department of Justice announced that it planned to proceed with enforcement actions against certain California tribes engaged in un-compacted class III gaming if those tribes did not enter compacts with the State before October 13, 1999.
 
 
 36
 The State delivered a new draft compact to the tribes on August 27, 1999. A third round of negotiations then took place in Sacramento from August 30 until September 3, and again from September 6 to September 10. At a meeting conducted on August 31, attended by each of the tribal negotiating groups, the tribes expressed three primary concerns with the August 27 draft circulated by the State. First, the tribes objected to the limits placed on the number of new gaming machines they could acquire. Second, they contended that the required contributions to the compact's revenue-sharing funds were overly burdensome. Third, they expressed their continuing belief that it was inappropriate under IGRA for the State to insist on the inclusion of a labor relations provision.
 
 
 37
 The State responded by circulating a revised draft on September 7 and a final offer on September 9. The final draft included several changes from the August 27 draft, the most significant of which was an expansion of the types of games that tribes were permitted to conduct. Each of the previous drafts (indeed, even Proposition 5's model compact), had permitted only gaming devices and banked card games that paid prizes in accordance with a "players' pool prize system." By contrast, the final State proposal, in a major concession, permitted the tribes to operate real Las Vegas-style slot machines and house-banked blackjack. See K. Alexa Koenig, Gambling on Proposition 1A: The California Indian Self Reliance Amendment, 36 U.S.F. L. REV. 1033, 1043-44 (2002) ("In exchange for a percent of tribal gaming revenue, the governor offered tribes even more than what they had sought with Proposition 5: ... full Las Vegas-style slot machines, as well as an exclusive right to conduct class III gaming in the state.").[12]
 
 
 38
 According to Coyote Valley, the State delivered this final offer at approximately 8:00 p.m. and required that the tribes respond by 10:00 p.m. that same night if they wished to accept. A representative from Coyote Valley went to the Governor's office during this two hour interval to discuss the tribe's concerns with the proposed compact, but the State's negotiating team was inaccessible. Several tribal leaders and attorneys sought to meet with the Governor's negotiating team at this same time. The Governor's negotiating team met with one tribal employee and one tribal attorney, neither of whom represented Coyote Valley. The remaining people were escorted from the Governor's reception room.
 
 
 39
 That night, 57 tribes (including Coyote Valley) signed letters of intent to enter the compact. Only one tribe initially refused, and it signed the letter a few days later with slight modifications to the compact. That tribe was the Agua Caliente Band of Cahuilla Indians of Palm Springs ("Agua Caliente"). Frustrated with the lull in negotiations in June, July, and early August, Agua Caliente had begun a campaign to place Proposition 5 (and its model compact) back on the ballot, this time as a constitutional amendment. Agua Caliente had gathered enough signatures to qualify the initiative for the April 2000 ballot when Governor Davis made the unexpected concession offering tribes the right to operate real Las Vegas style slot machines as well as house-banked blackjack. In response, Agua Caliente withdrew its initiative petition. Agua Caliente signed a letter of intent to enter the Davis Compact on September 14, 1999.
 
 
 40
 The core of the negotiated compact (the "Davis Compact") is that the State granted the tribes the exclusive right to conduct lucrative Las Vegas-style class III gaming, free from non-tribal competition in the State. In return, the tribes agreed to a number of restrictions and obligations concerning their gaming enterprises.[13] Specifically, the tribes agreed to three provisions that Coyote Valley contends in this suit are impermissible and whose inclusion in the ultimate compact demonstrates the bad faith of the State. These challenged provisions are: (1) the Revenue Sharing Trust Fund provision; (2) the Special Distribution Fund provision; and (3) the Labor Relations provision.[14]
 
 
 41
 The Revenue Sharing Trust Fund: The preamble to the Davis Compact recites that the "State has an interest in promoting the purposes of IGRA for all federally-recognized Indian tribes in California, whether gaming or non-gaming." In furtherance of this interest, Section 4.3.2.1 of the compact creates a Revenue Sharing Trust Fund (the "RSTF") that grants a maximum of $1.1 million dollars to each of the State's non-gaming tribes each year. The idea of gaming tribes sharing gaming revenue with non-gaming tribes originated in Proposition 5's "Nongaming Tribal Assistance Fund," and this idea had been incorporated into the UTCSC discussion draft of June 17. Under Section 4.3.2.2 of the Davis Compact, gaming tribes fund the RSTF by purchasing "licenses" to acquire and maintain gaming devices in excess of the number they are authorized to use under Section 4.3.1. The cost of a license is graduated: $900 per year per machine for the first 400 machines in excess of 350; $1950 per year per machine for the next 500 machines in excess of 750; and $4350 per year per machine for the next 750 machines in excess of 1250. In no event can a tribe acquire licenses for more than 2000 machines. In addition, for each license tribes are required to pay into the RSTF a one-time fee of $1250. According to the State, the purpose of the progressive fee structure is to ensure that tribes with the largest, and therefore most lucrative, gaming establishments will pay a relatively greater share in supporting other California tribes in return for the right to operate additional licensed machines. The progressive fee structure also assists in achieving the State's objective of limiting the expansion of gaming facilities.
 
 
 42
 The Special Distribution Fund: The preamble to the compact also recites that the
 
 
 43
 exclusive rights that Indian tribes in California[] will enjoy under this Compact create a unique opportunity for the Tribe to operate its Gaming Facility in an economic environment free of competition from the Class III gaming referred to in Section 4.0 of this Compact on non-Indian lands in California. The parties are mindful that this unique environment is of great economic value to the Tribe and the fact that income from Gaming Devices represents a substantial portion of the tribes' gaming revenues. In consideration for the exclusive rights enjoyed by the tribes, and in further consideration for the State's willingness to enter into this Compact, the tribes have agreed to provide the State, on a sovereign-to-sovereign basis, a portion of its revenue from Gaming Devices.
 
 
 44
 Pursuant to this part of the preamble, the compact provides in Section 5 for the creation of a Special Distribution Fund ("SDF"), to be financed out of the tribes' net win from the operation of their gaming devices. As provided in Section 5.1, the amount that goes to the fund is to be calculated as 0% of the net win for the first 200 terminals, 7% of the net win for the next 300 terminals, 10% of the net win for the next 500 terminals, and 13% of the net win for any additional terminals above 1000. Section 5.2 provides that the revenue deposited in the SDF is available for appropriation by the Legislature for the following specified purposes: (a) grants for programs designed to address gambling addiction; (b) grants for the support of state and local government agencies impacted by tribal gaming; (c) compensation for regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the implementation and administration of the compact; (d) payment of shortfalls that may occur in the RSTF; and (e) "any other purposes specified by the legislature." The compact states that it "is the intent of the parties that Compact Tribes will be consulted in the process of identifying purposes for grants made to local governments."
 
 
 45
 The Labor Relations Provision: Section 10.7 of the compact provides that it
 
 
 46
 shall be null and void if, on or before October 13, 1999, the Tribe has not provided an agreement or other procedure acceptable to the State for addressing organizational and representational rights of Class III Gaming Employees and other employees associated with the Tribe's Class III gaming enterprise, such as food and beverage, housekeeping, cleaning, bell and door services, and laundry employees at the Gaming Facility or any related facility, the only significant purpose of which is to facilitate patronage at the Gaming Facility.
 
 
 47
 Between late July and September 1999, California tribes conducted independent negotiations with labor representatives and agreed on a model Tribal Labor Relations Ordinance (the "TLRO") that meets the requirements of Section 10.7. The TLRO provides limited organizational rights to workers at tribal gaming establishments and related facilities that employ 250 or more employees.[15] These rights include union access to eligible employees in break rooms and locker rooms during non-work time, as well as the right to engage in collective bargaining if the union becomes the exclusive collective bargaining representative by winning an election. The TLRO also contains several provisions that protect tribal interests. For example, it guarantees tribal gaming establishments the right to grant employment preferences to Native Americans, places strict limits upon a union's right to strike, and completely prohibits picketing on Indian lands.
 
 
 48
 Coyote Valley initially signed a letter of intent stating that it accepted the Davis Compact, including the three just described provisions it now challenges. However, when the time came actually to execute the compact, Coyote Valley refused. In a letter dated October 13, 1999, Coyote Valley informed the State that before it would agree to sign, it needed to meet with State representatives to discuss "various issues and concerns" regarding certain provisions in the Davis Compact. The State replied in a letter dated October 18, 1999. The State did not respond to the tribe's request for a meeting, but instead emphasized the numerous negotiating opportunities the tribe had had, and highlighted the fact that the tribe had already signed a letter of intent to enter the Davis Compact. The tribe responded by letter on October 20, again requesting a meeting with the State on an individual tribal basis to discuss its concerns. The State replied on October 25, asking that Coyote Valley submit in writing any proposed changes or modifications to the Davis Compact for consideration.
 
 
 49
 Coyote Valley submitted its proposed changes to the State on November 12. In addition to several other modifications, the tribe sought: (1) the complete elimination of the RSTF provision; (2) a limitation of its obligation to contribute to the SDF to only those amounts necessary to reimburse the costs to the State of regulating activities at Coyote Valley's gaming facility; and (3) the complete elimination of the Labor Relations provision. In an accompanying cover letter, Coyote Valley indicated that it was only proposing changes "to the provisions of the Compact that it views as irreconcilable with [] IGRA." The tribe also indicated that it was putting into place its own "Tribal Employees Rights Ordinance" (rather than the TLRO) to address the rights of its class III gaming employees, and that it would forward the document to the State shortly.
 
 
 50
 The State replied on December 8, rejecting all of Coyote Valley's proposed modifications. The State specifically indicated that the tribe must adopt a labor ordinance identical to the TLRO in order for that ordinance to be acceptable to the State under Section 10.7 of the Davis Compact. The State indicated that it would be willing to meet with the tribe's representative to discuss the State's position and to allow the tribe an opportunity to discuss its position. No such meeting ever occurred.
 
 
 51
 Section 11.1(c) of the Davis Compact provides that it will not take effect "unless and until" Proposition 1A is approved by California voters. On September 10, 1999, the State Legislature passed Proposition 1A; the voters of California ratified it on March 7, 2000. On May 5, 2000, the United States Secretary of the Interior approved, pursuant to 25 U.S.C. § 2710(d)(8)(A), the Tribal-State compacts entered into between the State and 60 tribes. See 65 Fed.Reg. 31189 (May 16, 2000). Because Coyote Valley had refused to sign the compact, it was not among those tribes.
 
 
 52
 Coyote Valley had earlier filed a complaint in the District Court for the Northern District of California alleging a lack of good faith negotiation by the Wilson Administration. In December 1999, after the State rejected the tribe's proposed modifications to the Davis Compact, Coyote Valley amended its complaint to allege a lack of good faith negotiation by both the Wilson and Davis Administrations. The tribe moved for an order requiring the State to negotiate in good faith pursuant to 25 U.S.C. § 2710(d)(7)(B)(iii). The District Court denied the motion on August 22, 2000, and again on reconsideration on June 15, 2001. The tribe timely appealed.
 
 
 53
 We review mixed questions of law and fact de novo. Diamond v. City of Taft, 215 F.3d 1052, 1055 (9th Cir.2000). A mixed question of law and fact exists where the relevant facts are undisputed and the question is whether those facts satisfy the applicable legal rule. Id. Very few of the relevant facts in this case, as set forth in the preceding narrative, are in dispute. To the extent that there is a difference in the competing versions of the facts, we accept, for purposes of this appeal, Coyote Valley's version. The issue before us is whether, on these facts, the State has satisfied IGRA's good faith requirement. On this legal issue, we review the district court's decision de novo.
 
 II. Discussion
 
 54
 * IGRA provides that, in determining whether a State has negotiated in good faith, a court:
 
 
 55
 (I) may take into account the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities, and
 
 
 56
 (II) shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith.
 
 
 57
 25 U.S.C. § 2710(d)(7)(B)(iii). "[U]pon the introduction of evidence by an Indian tribe that ... the State ... did not respond to [the request of the Indian tribe to negotiate a compact] in good faith, the burden of proof shall be upon the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(7)(B)(ii). See S.Rep. No. 100-446, at 15 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3085 ("The Committee notes that it is States not tribes, that have crucial information in their possession that will prove or disprove tribal allegations of failure to act in good faith. Furthermore, the bill provides that the court, in making its [good faith] determination, may consider any of the number of issues listed in this section, including the State's public interest and other claims. The Committee recognizes that this may include issues of a very general nature and, and course [sic], trusts that courts will interpret any ambiguities on these issues in a manner that will be most favorable to tribal interests consistent with the legal standard used by courts for over 150 years in deciding cases involving Indian tribes.").
 
 
 58
 Section 2710(d)(3)(C) of IGRA provides that any Tribal-State compact negotiated under § 2710(d)(3)(A) may include provisions relating to:
 
 
 59
 (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of [gaming] activity;
 
 
 60
 (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
 
 
 61
 (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
 
 
 62
 (iv) taxation by the Indian tribe of such activity in such amounts comparable to amounts assessed by the State for comparable activities;
 
 
 63
 (v) remedies for breach of contract;
 
 
 64
 (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
 
 
 65
 (vii) any other subjects that are directly related to the operation of gaming activities.
 
 
 66
 25 U.S.C. § 2710(d)(3)(C). Section 2710(d)(4) provides that except for any assessments that may be agreed to under paragraph (3)(C)(iii), "nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity."
 
 
 67
 IGRA's legislative history gives guidance to courts deciding whether a party has negotiated in good faith. Because of the scant authority interpreting or applying IGRA's good faith requirement, we set forth a somewhat lengthy excerpt from the Senate Committee Report:
 
 
 68
 In the Committee's view, both State and tribal governments have significant governmental interests in the conduct of class III gaming. States and tribes are encouraged to conduct negotiations within the context of the mutual benefits that can flow to and from tribe and States [sic]. This is a strong and serious presumption that must provide the framework for negotiations. A tribe's governmental interests include raising revenues to provide governmental services for the benefit of the tribal community and reservation residents, promoting public safety as well as law and order on tribal lands, realizing the objectives of economic self-sufficiency and Indian self-determination, and regulating activities of persons within its jurisdictional borders. A State's governmental interests with respect to class III gaming on Indian lands include the interplay of such gaming with the State's public policy, safety, law and other interests, as well as impacts on the State's regulatory system, including its economic interest in raising revenue for its citizens. It is the Committee's intent that the compact requirement for class III gaming not be used as a justification by a State for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes.
 
 
 69
 ....
 
 
 70
 The terms of each compact may vary extensively depending on the type of gaming, the location, the previous relationship of the tribe and State, etc. Section [](d)(3)(C) describes the issues that may be the subject of negotiations between a tribe and a State in reaching a compact. The Committee recognizes that subparts of each of the broad areas may be more inclusive. For example, licensing issues under clause vi may include agreements on days and hours of operation, wage and pot limits, types of wagers, and size and capacity of the proposed facility. A compact may allocate most or all of the jurisdictional responsibility to the tribe, to the State or to any variation in between. The Committee does not intend that compacts be used as a subterfuge for imposing State jurisdiction on tribal lands.
 
 
 71
 ....
 
 
 72
 Finally, the bill allows States to consider negative impacts on existing gaming activities. That is not to say that the bill would allow States to reject Indian gaming on the mere showing that Indian gaming will compete with non-Indian games. Rather, the States must show that economic consequences will be severe and that they will clearly outweigh positive economic consequences.
 
 
 73
 S. REP. 100-446, at 13-14 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3083-84.
 
 B
 
 74
 Coyote Valley makes two kinds of arguments. The first is procedural. The tribe contends that the State's conduct during negotiations — specifically its dilatory tactics over the course of a seven-year period — constitutes bad faith. The second is substantive. The tribe contends that the RSTF, SDF, and Labor Relations provisions of the Davis Compact fall outside the list of appropriate topics for Tribal-State compacts set forth in 25 U.S.C. § 2710(d)(3)(C), and that the State therefore acted with "per se bad faith" when it demanded that these provisions be included in any compact it entered with the tribe. The tribe also contends that the State's insistence on the RSTF and SDF provisions constitutes a "demand by the State for direct taxation of the Indian tribe," giving rise to a statutory presumption that the State has not negotiated in good faith. 25 U.S.C. § 2710(d)(7)(B)(iii)(II).
 
 1. Procedural Objections
 
 75
 We cannot conclude from the history of negotiations recounted above that, as a procedural matter, the State has refused to negotiate in good faith. It is clear that the Wilson Administration was not sympathetic to tribal gaming and was exceedingly reluctant to reach any agreement that the tribes considered acceptable. But the gravamen of Coyote Valley's amended complaint is that the Davis Administration, rather than the Wilson Administration, has refused to negotiate in good faith; and it is against the Davis Administration that Coyote Valley seeks injunctive relief.
 
 
 76
 On the record before us, it appears that the Davis Administration has actively negotiated with Indians tribes, including Coyote Valley, concerning class III gaming, and that it has negotiated despite the absence of any legal obligation to do so. Until Proposition 1A was ratified in March of 2000, the State had no obligation to negotiate with Coyote Valley over the types of class III games covered in the Davis Compact. See Rumsey, 64 F.3d 1250 (holding that the phrase "such gaming" in IGRA does not include all class III gaming). Moreover, at the time Coyote Valley filed its amended complaint with the district court, alleging bad faith by the Wilson and Davis Administrations, the State remained willing to meet with the tribe for further discussions. To the extent that Coyote Valley may have a valid objection to negotiations by the Davis Administration, it is not an objection to the timing and procedures of those negotiations. It is, rather, an objection to the substance of the three provisions of the Davis Compact to which Coyote Valley specifically objects.
 
 2. Substantive Objections
 
 77
 We do not believe that the three challenged provisions are categorically forbidden by the terms of IGRA. Nor do we believe on the facts of this case that the State's insistence on their inclusion in the compact demonstrates a lack of good faith.
 
 
 78
 a. The Revenue Sharing Trust Fund
 
 
 79
 Coyote Valley first argues that the Revenue Sharing Trust Fund, which requires that gaming tribes share gaming revenues with non-gaming tribes, is impermissible under IGRA. Coyote Valley takes the position that except for "assessment[s] by the State [] in such amounts as are necessary to defray the costs of regulating" tribal gaming activities, 25 U.S.C. § 2710(d)(3)(C)(iii), a provision in a Tribal-State compact requiring that the tribe pay a "tax, fee, charge, or other assessment" to the State or a third party is categorically prohibited, id. § 2710(d)(4). The tribe relies on § 2710(d)(4) and § 2710(d)(7)(B)(iii)(II), and emphasizes Congress's concern that States would use the negotiation process as a means of extracting forbidden taxes from tribes. See Oklahoma Tax Comm'n v. Chickasaw Nation, 515 U.S. 450, 458, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (explaining that absent express Congressional permission, a State is without power to tax reservation lands and reservation Indians). Because the RSTF provision requires payments from compacting tribes that go beyond amounts necessary to defray the costs incurred by the State in regulating class III gaming, Coyote Valley contends that the provision cannot properly be included in a Tribal-State compact.[16] By insisting that this forbidden provision be included in the compact, the tribe argues, the State failed to negotiate in good faith.
 
 
 80
 As explained more fully below, we hold that § 2710(d)(3)(C)(vii) authorizes the RSTF provision and that the State did not lack good faith when it insisted that Coyote Valley adopt it as a precondition to entering a Tribal-State compact. In so holding, we do not interpret IGRA as "conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge or other assessment upon an Indian tribe." 25 U.S.C. § 2710(d)(4) (emphasis added). Given that the State offered meaningful concessions in return for its demands, it did not "impose" the RSTF within the meaning of § 2710(d)(4). To the extent that the State's insistence on the RSTF provision constitutes a "demand by the State for direct taxation of the Indian tribe," id. § 2710(d)(7)(B)(iii)(II), which we do not decide, the State has successfully rebutted any inference of bad faith created thereby.
 
 
 81
 Section 2710(d)(3)(C)(vii) explicitly provides that a "Tribal-State compact ... may include provisions relating to ... subjects that are directly related to the operation of gaming activities." It is clear that the RSTF provision falls within the scope of paragraph (3)(C)(vii). Congress sought through IGRA to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments." Id. § 2702(1). The RSTF provision advances this Congressional goal by creating a mechanism whereby all of California's tribes — not just those fortunate enough to have land located in populous or accessible areas — can benefit from class III gaming activities in the State. See Washburn, 1 Wyo. L. Rev. at 435 ("Not surprisingly, the most successful gaming operations are located in close proximity to large urban areas. A handful of tribes blessed by geography and demographics have been fabulously successful. The poorest of tribes have remained the poorest communities in the United States."). Moreover, the provision accomplishes this in a manner directly related to the operation of gaming activities.
 
 
 82
 Coyote Valley asks us to read § 2710(d)(3)(C)(vii) narrowly and to hold that it does not encompass a provision like the RSTF. The tribe invokes the Senate Committee's statement that we should "interpret any ambiguities on these issues in a manner that will be most favorable to tribal interests." S. REP. No. 100-446, at 15 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3085. Even with the assistance of this language from the legislative history, we do not agree with Coyote Valley's reading of paragraph (3)(C)(vii). First, we believe that the paragraph is not ambiguous and that the RSTF provision clearly falls within its scope. Second, we do not believe that Coyote Valley's preferred reading of paragraph (3)(C)(vii) as forbidding revenue-sharing with non-gaming tribes is the interpretation "most favorable to tribal interests." See Koenig, 36 U.S.F. L. REV. at 1035 ("For tribes that have not elected to take part in gaming, or whose lands are too far from urban centers to make gaming feasible, revenue sharing agreements have reduced dependence on welfare, and produced critical income to ensure basic provisions for tribal members."). Third, it is clear from the legislative history that by limiting the proper topics for compact negotiations to those that bear a direct relationship to the operation of gaming activities, Congress intended to prevent compacts from being used as subterfuge for imposing State jurisdiction on tribes concerning issues unrelated to gaming. See S. REP. No. 100-446, at 14 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3084. In advocating the inclusion of the RSTF, the State has not sought to engage in such a subterfuge.
 
 
 83
 We also reject Coyote Valley's argument that, regardless of whether the RSTF provision would otherwise fall within § 2710(d)(3)(C)(vii), it cannot in good faith be included in a Tribal-State compact because it violates § 2710(d)(4). That paragraph provides:
 
 
 84
 Except for any assessments that may be agreed to under paragraph (3)(C)(iii) of this subsection, nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity. No State may refuse to enter into the negotiations described in paragraph (3)(A) based upon the lack of authority in such State, or its political subdivisions, to impose such a tax, fee, charge, or other assessment.
 
 
 85
 25 U.S.C. § 2710(d)(4). The plain language of this paragraph forbids us from construing anything in § 2710 as conferring upon the State an "authority to impose" taxes, fees, charges, or other assessments on Indian tribes. See also S. REP. No. 100-446, at 18 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3088 (stating that § 2710(d)(4) "[c]larifies that [IGRA] does not confer on any state any authority to tax or to otherwise assess any Indian Tribe"). However, our interpretation of paragraph (3)(C)(vii) as authorizing the RSTF provision does not run afoul of this prohibition.
 
 
 86
 We do not hold that the State could have, without offering anything in return, taken the position that it would conclude a Tribal-State compact with Coyote Valley only if the tribe agreed to pay into the RSTF. Where, as here, however, a State offers meaningful concessions in return for fee demands, it does not exercise "authority to impose" anything. Instead, it exercises its authority to negotiate, which IGRA clearly permits. See S. REP. No. 100-446, at 13 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3083 (describing the compacting process as a "viable mechanism for setting various matters between two equal sovereigns"). Depending on the nature of both the fees demanded and the concessions offered in return, such demands might, of course, amount to an attempt to "impose" a fee, and therefore amount to bad faith on the part of a State. If, however, offered concessions by a State are real, § 2710(d)(4) does not categorically prohibit fee demands. Instead, courts should consider the totality of that State's actions when engaging in the fact-specific good-faith inquiry IGRA generally requires. See 25 U.S.C. § 2710(d)(7)(B)(iii).
 
 
 87
 In this case, Coyote Valley cannot seriously contend that the State offered no real concessions in return for its insistence on the RSTF provision. Under our holding in Rumsey, the State had no obligation to enter any negotiations at all with Coyote Valley concerning most forms of class III gaming. Nor did the State have any obligation to amend its constitution to grant a monopoly to tribal gaming establishments or to offer tribes the right to operate Las Vegas-style slot machines and house-banked blackjack. As part of its negotiations with the tribes, the State offered to do both things. We therefore reject the tribe's challenge to the RSTF premised on § 2710(d)(4).
 
 
 88
 Finally, Coyote Valley relies on § 2710(d)(7)(B)(iii)(II), which provides that courts "shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith." We need not decide whether the fee structure used to fund the RSTF constitutes a "direct tax"; nor need we determine whether the State "demanded" it. Even if we assume that both are true, we would still find that the State did not negotiate in bad faith by taking the position that any compact it would enter with Coyote Valley must include the RSTF provision. Paragraph (7)(B)(iii)(II) provides only that a court "shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith." Id. § 2710(d)(7)(B)(iii)(II) (emphasis added). Coyote Valley would have us read "evidence" to mean "conclusive proof." This we cannot do. Not only does the plain language of the paragraph forbid such a construction, but IGRA's legislative history also makes clear that the good faith inquiry is nuanced and fact-specific, and is not amenable to bright-line rules. See S. REP. No. 100-446, at 14 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3084 ("The terms of each compact may vary extensively depending on the type of gaming, the location, the previous relationship of the tribe and State, etc."). See also 25 U.S.C. § 2710(d)(7)(B)(ii).
 
 
 89
 On the facts of this case, we do not find that the State's demands regarding the RSTF provision amount to bad faith. That provision does not put tribal money into the pocket of the State. Rather, it redistributes gaming profits to other Indian tribes. The idea of gaming tribes sharing revenue with non-gaming tribes traces its origins not to a State-initiated proposal, but rather to tribe-drafted and tribe-sponsored Proposition 5. Moreover, the UTCSC, of which Coyote Valley was a member, suggested in its discussion draft of June 17 that just such a provision be included in the Davis Compact. Every other compacting tribe in California has agreed to the provision.
 
 
 90
 Given that the State offered significant concessions to tribes during the course of negotiations in return for the RSTF provision, that the provision originated in proposals by the tribes and now has strong support among the tribes, and that Coyote Valley was not excluded from the negotiations that shaped the RSTF provision, we hold that the State did not act in bad faith by refusing to enter a compact with Coyote Valley that did not include this provision.
 
 
 91
 b. The Special Distribution Fund
 
 
 92
 Unlike contributions to the RSTF, money that goes into the Special Distribution Fund does go into the pocket of the State. But it does not go into just any pocket. Although at the outset of compact negotiations with the UTCSC the State sought unrestricted access to a percentage of the tribes' net win from gaming devices, the SDF provision ultimately incorporated into the Davis Compact is much more restrictive. It provides that money from the SDF may be appropriated by the Legislature for only the following purposes:
 
 
 93
 (a) grants for programs designed to address gambling addiction;
 
 
 94
 (b) grants for the support of state and local government agencies impacted by tribal gaming;
 
 
 95
 (c) compensation for regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the implementation and administration of the compact;
 
 
 96
 (d) payment of shortfalls that may occur in the RSTF; and
 
 
 97
 (e) any other purposes specified by the legislature.
 
 
 98
 The district court interpreted subsection (e) under the ejusdem generis principle to be "limited to purposes that, like the first four enumerated purposes, are directly related to gaming." (Emphasis added.) See United States v. Lacy, 119 F.3d 742, 748 (9th Cir.1997) ("[A] general term following more specific terms means that the things embraced in the general term are of the same kind as those denoted by the specific terms." (internal quotation marks omitted)). The State does not contest that construction on appeal, and we adopt it here.
 
 
 99
 Coyote Valley raises objections to the SDF provision similar to those it raised against the RSTF provision. Specifically, it argues that the SDF provision both falls outside the proper scope for compact negotiations set forth in § 2710(d)(3)(C) and constitutes a direct tax within the meaning of § 2710(d)(7)(B)(iii)(II). We first consider whether a requirement that tribes fund any or all of the items listed in the SDF provision falls within the permissible scope of a Tribal-State compact pursuant to § 2710(d)(3)(C). We can quickly approve the funding specified in subsection (c) of the SDF provision ("compensation for regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the implementation and administration of the compact"). Pursuant to 25 U.S.C. § 2710(d)(3)(C)(iii), assessments on tribes designed to cover the State's costs of regulating Indian gaming are clearly appropriate, and by demanding such assessments the State does not act in bad faith. We can likewise easily dispose of the tribe's challenge to subsection (d) ("payment of shortfalls that may occur in the [RSTF]"); its inclusion in the Davis Compact does not demonstrate a lack of good faith for the same reasons that the inclusion of the RSTF provision did not demonstrate a lack of good faith. See supra. That leaves subsections (a) ("grants [] for programs designed to address gambling addiction"), (b) ("grants [] for the support of state and local government agencies impacted by tribal [] gaming"), and (e) ("any other purposes [directly related to gaming] specified by the legislature"). Although these provisions do not fit comfortably within paragraph (3)(C)(iii), it cannot seriously be doubted that each are "directly related to the operation of gaming activities" and are thus permissible under paragraph (3)(C)(vii). Coyote Valley argues that to interpret § 2710(d)(3)(C)(vii) as encompassing these provisions violates § 2710(d)(4), but we reject this argument for the reasons stated in the previous section.
 
 
 100
 We next determine whether the State acted in bad faith by insisting on the inclusion of the SDF provision in the Davis Compact. Even if the State's insistence on this provision was indeed a "demand" for a "direct tax" (which we do not decide), we hold that circumstances exist in this case to justify the State's conduct. As explained above, a State's demand for direct taxation of an Indian tribe constitutes only "evidence" of bad faith that courts "shall consider." 25 U.S.C. § 2710(d)(7)(B)(iii)(II). This evidence is not conclusive, and on the facts of this case the State's demands do not establish bad faith. See S. REP. No. 100-446, at 14 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3084 (explaining that, depending upon the "previous relationship of the tribe and State," the "terms of each compact may vary extensively"). As noted above, the terms of the compact restrict what the State can do with the money it receives from the tribes pursuant to the SDF provision, and all of the purposes to which such money can be put are directly related to tribal gaming.[17] While the contributions tribes must make to the SDF are significant, the tribes receive in exchange an exclusive right to conduct class III gaming in the most populous State in the country. We do not find it inimical to the purpose or design of IGRA for the State, under these circumstances, to ask for a reasonable share of tribal gaming revenues for the specific purposes identified in the SDF provision.
 
 
 101
 Congress did not intend to allow States to invoke their economic interests "as a justification ... for excluding Indian tribes from" class III gaming; nor did Congress intend to permit States to use the compact requirement "as a justification ... for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes." Id. at 13, 3083. By the same token, however, Congress also did not intend to require that States ignore their economic interests when engaged in compact negotiations. See id. at 2, 3071 ("An [] objective inherent in any government regulatory scheme is to achieve a fair balancing of competitive economic interests."). Indeed, § 2710(d)(7)(B)(iii)(I) expressly provides that we may take into account the "financial integrity" of the State and "adverse economic impacts on [the State's] existing gaming activities" when deciding whether the State has acted in bad faith, and IGRA's legislative history explains that a "State's governmental interests with respect to class III gaming on Indian lands include ... its economic interest in raising revenue for its citizens." S. REP. No. 100-446, at 13 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3083.
 
 
 102
 Here the State did not use compact negotiations to protect "other State-licensed gaming enterprises from free market competition with Indian tribes." Id. at 13, 3083. Instead, the State proposed a constitutional amendment protecting tribal gaming enterprises from free market competition by the State, even though it had no obligation to do so. We conclude that for the State to demand that Coyote Valley, in exchange for these exclusive gaming rights, accede to the limited revenue sharing required in the SDF provision does not constitute bad faith. The tribes who drafted and placed Proposition 5 on the ballot thought such an exchange was fair. The Proposition 5 model compact required that tribes, in exchange for exclusive rights to conduct certain class III games in the State, contribute funds to counties in California to supplement emergency medical care and programs on addictive gambling and to address the needs of the cities or counties within the boundaries of which tribal gaming facilities are located. See Cal. Gov.Code § 98004, Secs. 5.3 & 5.4. The former Secretary of the Interior also appears to believe such an exchange is fair, given that he approved the Davis Compact in May 2000. See 65 Fed.Reg. 31189 (May 16, 2000). See also 25 U.S.C. § 2710(d)(8)(B) (providing that the Secretary may disapprove compacts that violate IGRA or the trust obligations of the United States to Indians).
 
 
 103
 c. The Labor Relations Provision
 
 
 104
 Finally, Coyote Valley contends that the Labor Relations provision is improper, arguing that labor relations are too far afield from tribal gaming to be an appropriate topic for Tribal-State compact negotiations. The State counters that because thousands of its citizens are employed at tribal casinos, it is proper for the State to insist on some minimal level of protection for those workers as a precondition to entering a Tribal-State compact.[18] We hold that the provision falls within the scope of § 2710(d)(3)(C)(vii) and that, under the circumstances of this case, the State did not act in bad faith in requiring that Coyote Valley adopt it or forgo entering a compact.
 
 
 105
 During the negotiation of the Davis Compact, the State did not demand that tribes adopt a specific set of legal rules governing general employment practices on tribal lands. Instead, it demanded that tribes meet with labor unions to negotiate independently a labor ordinance addressing only organizational and representational rights and applicable only to employees at tribal casinos and related facilities. This demand became Section 10.7 of the Davis Compact:
 
 
 106
 Notwithstanding any other provision of this Compact, this Compact shall be null and void if, on or before October 13, 1999, the Tribe has not provided an agreement or other procedure acceptable to the State for addressing organizational and representational rights of Class III Gaming Employees and other employees associated with the Tribe's Class III gaming enterprise, such as food and beverage, housekeeping, cleaning, bell and door services, and laundry employees at the Gaming Facility or any related facility, the only significant purpose of which is to facilitate patronage at the Gaming Facility.
 
 
 107
 We hold that this provision is "directly related to the operation of gaming activities" and thus permissible pursuant to 25 U.S.C. § 2710(d)(3)(C)(vii). Without the "operation of gaming activities," the jobs this provision covers would not exist; nor, conversely, could Indian gaming activities operate without someone performing these jobs. We therefore reject Coyote Valley's argument that IGRA categorically forbids its inclusion in the Davis Compact.
 
 
 108
 We also reject Coyote Valley's argument that the State acted in bad faith when it demanded that the Labor Relations provision be included in the compact. We may consider the public interest of the State when deciding whether it has negotiated in good faith, and a State's concern for the rights of its citizens employed at tribal gaming establishments is clearly a matter within the scope of that interest. 25 U.S.C. § 2710(d)(7)(B)(iii)(I); see also S. REP. No. 100-446, at 13 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3083 ("A State's governmental interests with respect to class III gaming on Indian lands include the interplay of such gaming with the State's public policy, safety, law and other interests...."); Cal. Labor Code § 923 (declaring it the public policy of the State "that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment"). Given that the State offered numerous concessions to the tribes in return for the Labor Relations provision (including the right to exclusive operation of Las Vegas style class III gaming in California), it did not constitute bad faith for the State to insist that this interest be addressed in the limited way provided in the provision.
 
 
 109
 Finally, Coyote Valley argues that even if the Labor Relations provision itself does not violate IGRA or demonstrate the State's bad faith, the State's insistence that only the specific later-negotiated Tribal Labor Relations Ordinance will satisfy that provision does show bad faith. Although this is a closer question, we continue to disagree with the tribe. The TLRO provides only modest organizing rights to tribal gaming employees and contains several provisions protective of tribal sovereignty. Further, the UTCSC, of which Coyote Valley was a member, met with union representatives and participated in the shaping of the TLRO. Finally, all compacting tribes in California have adopted it. Under these circumstances, and in light of the concessions granted by the State to the tribes, we hold that the State did not act in bad faith by requiring that Coyote Valley do the same.
 
 III. Conclusion
 
 110
 For the foregoing reasons, the district court's order denying Coyote Valley's motion is AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The Honorable Myron H. Bright, Senior Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 "In banked or percentage card games, players bet against the `house' or the casino. In `nonbanked' or `nonpercentage' card games, the `house' has no monetary stake in the game itself, and the players bet against one another."Artichoke Joe's, 216 F.Supp.2d at 1092 n. 3.
 
 
 [2]
 The Commission is a federal regulatory agency created by IGRA that oversees the business of Indian gaming in order to ensure its lasting integrity. It performs a variety of functions, such as the review of management contracts that tribes enter with outside parties to run tribal casinosSee 25 U.S.C. § 2704.
 
 
 [3]
 These remedial provisions have been substantially limited by the Supreme Court's decision inSeminole Tribe v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). See infra, note 5.
 
 
 [4]
 Coyote Valley first requested that the State enter into Tribal-State compact negotiations by letter dated March 29, 1992
 
 
 [5]
 Prior to our amended decision inRumsey, the Supreme Court held in Seminole Tribe v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), that the Eleventh Amendment prevents a tribe from enforcing the remedial provisions of IGRA against a State in federal court absent State consent. See Washburn, 1 WYO. L. REV. at 430 ("The Seminole decision has thrown the compacting process and Indian gaming itself into some disarray. While tribes may not lawfully engage in Class III gaming without a compact, tribes now lack the power to force states to come to the table to negotiate."). Because the State had agreed in Rumsey not to plead the Eleventh Amendment as a jurisdictional bar, Seminole Tribe did not affect this court's jurisdiction on appeal. See 64 F.3d at 1255 n. 3.
 
 
 [6]
 Beginning in November of 1994, Coyote Valley began conducting class III gaming in the absence of a Tribal-State compact. It continues to do so at present
 
 
 [7]
 In early 1998 the Wilson Administration did negotiate a Tribal-State compact with the Pala Band of Mission Indians, a tribe not then engaged in class III gamingHotel Employees, 21 Cal.4th at 597, 88 Cal.Rptr.2d 56, 981 P.2d 990. Governor Wilson intended for this compact to serve as a statewide model and invited other tribes (including Coyote Valley) to enter a compact substantially identical. Id. However, most of the State's tribes (including Coyote Valley) objected to both the manner in which the compact had been negotiated and the restrictions it placed on the type and number of gaming devices, and thus refused to accept the Governor's offer. Id.
 
 
 [8]
 Anticipating just such a challenge, Proposition 5 included the following language:
 The people of the state [] find that casinos of the type currently operating in Nevada and New Jersey are materially different from the tribal gaming facilities authorized under this chapter, including those in which the gaming activities under the Gaming Compact are conducted, in that the casinos in those states: (1) commonly offer their patrons a broad spectrum of house-banked games, including but not limited to house-banked card games, roulette, dice games, and slot machines that dispense coins or currency, none of which games are authorized under this chapter; and (2) are owned by private companies, individuals, or others that are not restricted on how their profits may be expended, whereas tribal governments must be the primary beneficiaries of the gaming facilities under this chapter and the Gaming Compact, and are limited to using their gaming revenues for various tribal purposes, including tribal government services and programs such as those that address reservation housing, elderly care, education, economic development, health care, and other tribal programs and needs, in conformity with federal law.
 Cal. Gov.Code § 98001(c).
 
 
 [9]
 Given the continuing validity of this statutory provision,Seminole Tribe does not affect our jurisdiction in this case.
 
 
 [10]
 According to an affidavit of the Special Counsel submitted in the district court in this case, Coyote Valley was not required to join or remain in a negotiating group, and the State never conditioned its willingness to engage in negotiations with Coyote Valley or any other tribe on such membership
 
 
 [11]
 Proposition 1A ultimately was ratified by California voters on March 7, 2000. It added the following language to Section 19 of Article IV:
 Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts.
 Cal. Const. Art. IV, § 19(f).
 
 
 [12]
 "In a player pool system, casinos charge a flat fee per play. For example, the house may charge a player twenty-five cents each time she places a five dollar bet, regardless of whether she wins or loses. Any money won by the player is made up of funds lost by previous players, from which the house takes nothing. By contrast, Las Vegas-style slot machines offer `house banked' games, which enable the house to collect players' losses." Koenig, 36 U.S.F. L. REV. at 1041 n. 65
 
 
 [13]
 Section 12.4 of the compact grants tribes the right to terminate the compact "in the event the exclusive right of Indian tribes to operate Gaming Devices in California is abrogated by the enactment, amendment, or repeal of a state statute or constitutional provision" or by a judicial decision
 
 
 [14]
 The complete compact may be viewed on the website of the California Gambling Control CommissionSee http://www.cgcc.ca.gov/tsc.pdf. We summarize here only those provisions relevant to Coyote Valley's appeal.
 
 
 [15]
 The TLRO defines a "related facility" as a facility "for which the only significant purpose is to facilitate patronage of the class III gaming operations."
 
 
 [16]
 Coyote Valley calculates that the one-time license fees required by the RSTF would cost it $2,020,000 and that the annual license fees would cost it an additional $4,597,500. These calculations assume that the tribe would operate the maximum number of machines allowable under the Davis Compact. The State does not agree that the tribe would necessarily operate that number of machines. Given the nature of our holding, it is unnecessary to resolve that dispute
 
 
 [17]
 The SDF provision in the Davis Compact differs in this respect from the revenue-sharing provisions found in Tribal State compacts entered into by the States of Connecticut, New Mexico, and New York, for example. In these States, revenue derived from tribal gaming goes into the States' general fundsSee Gatsby Contreras, Exclusivity Agreements in Tribal-State Compacts: Mutual Benefit Revenue Sharing or Illegal State Taxation?, 5 J. GENDER RACE & JUST. 487, 495-501 (2002). Thelegality of such compacts is not before us, and we intimate no view on the question.
 
 
 [18]
 According to statistics compiled by the National Indian Gaming Association, seventy-five percent of employees at tribal gaming establishments in the United States are non-IndiansSee http://www.indiangaming.org/ library/index.html.