147 F.Supp.2d 1011 (2001)
In re INDIAN GAMING RELATED CASES
Coyote Valley Band of Pomo Indians, Plaintiffs,
v.
The State of California, Defendant.
Nos. C 97-04693, C 98-01806 CW.
United States District Court, N.D. California.
June 15, 2001.
*1012 *1013 Eduardo G. Roy, Arter & Hadden LLP, San Francisco, CA, Bradley G. Downes, Office of Tribal Atty., Hoopa, CA, Thomas P. Schlosser, Morisset, Schlosser, Ayer & Jozwiak, Seattle, WA, for Plaintiffs.
Kenneth R. Williams, Sara J. Drake, Atty. General's Office, Sacramento, CA, for Defendant.
Richard G. McCracken, J. Thomas Bowen, Elizabeth A. Lawrence, Davis, Cowell & Bowe, San Francisco, CA, Art Bunce, Law Office of Art Bunce, Escondido, CA, Amicus Curiae.
AMENDED ORDER DENYING COYOTE VALLEY'S MOTION FOR AN ORDER PURSUANT TO 25 U.S.C. §§ 2710(d)(7)(B)(iii) and (iv)
WILKEN, District Judge.
This complaint was filed pursuant to the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-2721. Plaintiff Coyote Valley Band of Pomo Indians (Coyote Valley) moves for an order requiring Defendant State of California to negotiate with it pursuant to 25 U.S.C. § 2710(d)(7)(B)(iii) and (iv). The State opposes the motion. A hearing on the motion was held on February 25, 2000. Having considered all of the papers filed by the parties and oral argument on the motion, the Court denied the motion. This Amended Order supersedes the order previously filed on August 22, 2000.

BACKGROUND
The State and many Indian tribes have been negotiating for several years over the tribes' right to conduct gaming operations in the State. The negotiations have spawned numerous lawsuits, including many filed in this district. In October, 1999, the State and most of the tribes signed gaming compacts. Coyote Valley did not sign a compact. The relevant details of the negotiations between Coyote Valley and the State are discussed as necessary below.

DISCUSSION

I. Legal Framework
In enacting IGRA in 1988, Congress created a statutory framework for the operation and regulation of gaming by Indian tribes. See 25 U.S.C. § 2702. IGRA provides that Indian tribes may conduct certain gaming activities only if authorized pursuant to a valid compact between the tribe and the State in which the gaming activities are located. See id. § 2710(d)(1)(C). If an Indian tribe requests that a State negotiate over gaming activities that are permitted within that State, the State is required to negotiate in good faith toward the formation of a compact that governs the proposed gaming activities. See id. § 2710(d)(3)(A); Rumsey Indian Rancheria of Wintun Indians v. Wilson, 64 F.3d 1250, 1256-58 (9th Cir. 1994). Tribes may bring suit in federal court against a State that fails to negotiate in good faith, in order to compel performance of that duty, see 25 U.S.C. § 2710(d)(7), but only if the State consents to such suit. See Seminole Tribe v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The State of California has consented to such suits. See Cal Gov't Code § 98005; Hotel Employees & Restaurant Employees Int'l Union v. *1014 Davis, 21 Cal.4th 585, 614-15, 88 Cal. Rptr.2d 56, 981 P.2d 990 (1999).
IGRA defines three classes of gaming on Indian lands, with a different regulatory scheme for each class. Class III gaming is defined as "all forms of gaming that are not class I gaming or class II gaming." 25 U.S.C. § 2703(8). Class III gaming includes, among other things, slot machines, casino games, banking card games, dog racing and lotteries. Class III gaming is lawful only where it is (1) authorized by an appropriate tribal ordinance or resolution; (2) located in a State that permits such gaming for any purpose by any person, organization or entity; and (3) conducted pursuant to an appropriate tribal-State compact. See id. § 2710(d)(1).
IGRA prescribes the process by which a State and an Indian tribe are to negotiate a gaming compact:
Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.
Id. § 2710(d)(3)(A). IGRA enumerates several types of provisions that may be addressed in gaming compacts. See id. § 2710(d)(3)(C).
If a State fails to negotiate in good faith, the Indian tribe may, after the close of the 180-day period beginning on the date on which the Indian tribe requested the State to enter into negotiations, initiate a cause of action in a federal district court. See id. § 2710(d)(7)(A)(i). In such an action, the tribe must first show that no tribal-State compact has been entered into and that the State failed to respond in good faith to the tribe's request to negotiate. See id. § 2710(d)(7)(B)(ii). Assuming the tribe makes this prima facie showing, the burden then shifts to the State to prove that it did in fact negotiate in good faith. See id.[1] If the district court concludes that the State failed to negotiate in good faith, it "shall order the State and Indian Tribe to conclude such a compact within a 60-day period." Id. § 2710(d)(7)(B)(iii). If no compact is entered into within the next sixty days, the Indian tribe and the State must then each submit to a court-appointed mediator a proposed compact that represents their last best offer. See id. § 2710(d)(7)(B)(iv). The mediator chooses the proposed compact that "best comports with the terms of [IGRA] and any other applicable Federal law and with the findings and order of the court." See id. If, within the next sixty days, the State does not consent to the compact selected by the mediator, the mediator notifies the Secretary of the Interior, who then prescribes the procedures under which class III gaming *1015 may be conducted. See id. § 2710(d)(7)(B)(vii).

II. Issues Presented
Coyote Valley argues that the State did not negotiate in good faith. Coyote Valley's arguments can be divided into procedural and substantive objections to the State's conduct. Procedurally, Coyote Valley argues that the State, particularly under the Wilson administration but also under the current Davis administration, unreasonably delayed the initiation of negotiations, and repeatedly refused timely to meet with tribal representatives. Coyote Valley further argues that the State made its offers contingent on nearly immediate acceptance, which exerted a coercive force on the tribes. According to Coyote Valley, the State also took advantage of threats of forfeiture actions against the tribes by the United States Attorney. Finally, Coyote Valley argues that the State made its offer contingent upon the Agua Caliente Tribe ceasing its efforts to place on the March, 2000 ballot an Indian gaming initiative that would have competed with the State-sponsored gaming initiative. Substantively, Coyote Valley argues that the State refuses to enter into any compact with a tribe unless the tribe accepts State taxation on gaming revenues and enacts a specific tribal labor relations ordinance.

III. Procedural Issues
Any delays in the negotiations do not constitute bad faith. First, the Court accords the arguments concerning the Wilson administration little weight. Although IGRA does not specify the time period that should be evaluated in determining whether a State negotiated in good faith, common sense dictates that a State that has, in the recent past, negotiated in good faith should not be compelled to submit to the procedures set forth in 25 U.S.C. § 2710(d)(7)(B)(iii) and (iv) based on its conduct in the more distant past. With regard to the State's negotiations under the Davis administration, the record reflects that both parties at times were less than diligent in responding to the other's correspondence and requests. Any delays that may have been caused by the State do not rise to the level of bad faith.
The deadline imposed by the State for accepting its offer presents a closer question, but also does not evidence bad faith. The parties were operating under time pressures exerted by a number of forces, including the impending end of a State legislative session. While it might have been better had the State made its offer sooner, and provided the tribes with a longer period of time in which to consider the offer, it was under no obligation to do so.
Coyote Valley's objections to the demands that the State made of the Agua Caliente Tribe are unavailing. Had the Agua Caliente Tribe refused to accede to the State's demand regarding that tribe's proposed ballot initiative, and had the State then refused to negotiate a gaming compact with any tribe, Coyote Valley would be entitled to argue that the State did not act in good faith in its negotiations with Coyote Valley. However, that is not what happened. The Agua Caliente Tribe did cease its efforts regarding its proposed ballot initiative, and the State did negotiate with Coyote Valley and the other tribes. Regardless of whether the State's demands of the Agua Caliente Tribe were improper, Coyote Valley lacks standing to object to them; assuming the State's conduct is evidence of bad faith, it is evidence of bad faith in the negotiations between the State and the Agua Caliente Tribe, not the negotiations between the State and Coyote Valley.
Finally, the State cannot be held accountable for the conduct of the United *1016 States Attorney. Coyote Valley offers no evidence that the State conspired with the United States Attorney. Although Coyote Valley may believe the United States Attorney's conduct was improper, that purported impropriety cannot be imputed to the State.

IV. Substantive Issues
Coyote Valley argues that the proposed compact improperly requires tribes to make certain contributions to two State-controlled funds, and to enact a specific tribal labor relations ordinance. Coyote Valley contends that these provisions are not within the scope of allowable subject matter for gaming compacts. In the alternative, Coyote Valley argues that the positions adopted by the State on these issues demonstrate bad faith.

A. Challenged Provisions

1. Revenue Sharing Trust Fund
Coyote Valley objects to the provisions in the proposed compact that create a "Revenue Sharing Trust Fund." The Revenue Sharing Trust Fund provisions apply only to the operation of gaming devices beyond the maximum number of devices normally allowed. See Norris Dec., Ex. D (proposed compact) § 4.3.2.2. Coyote Valley does not, for the purposes of this motion, challenge the propriety of the proposed compact's limits on the number of gaming devices.[2] The compact provides that tribes that sign it may, by a certain procedure, obtain licenses to operate more than the usually allowed number of gaming devices. See Proposed Compact § 4.3.2.2(a). These licenses come from a State-wide pool of licenses, the size of which is determined by a formula that takes into account the number of tribes in the State that either are not operating any gaming devices, or are operating fewer than 350 such devices. See id. § 4.3.2.2(a)(1). The compact deems such tribes to be third-party beneficiaries of the compact, and the Revenue Sharing Trust Fund is used to make certain payments to these tribes. See id. §§ 4.3.2(a)(i) & 4.3.2.1. Although the Revenue Sharing Trust Fund is held in trust by the State, see id. § 4.3.2(a)(ii), the State cannot use the Revenue Sharing Trust Fund for any purpose other than to make the payments set forth in § 4.3.2.1. See id. § 4.3.2.1. In substance, the compact sets up a procedure by which tribes that have signed the proposed compact can license other tribes' right to operate gaming devices.

2. Special Distribution Fund
Coyote Valley also objects to the provisions in the proposed compact that create a "Special Distribution Fund." Unlike the Revenue Sharing Trust Fund payments, which are not based on the revenue generated by a tribe's gaming facilities, the Special Distribution Fund payments are calculated as a percentage of the "average gaming device net win." See id. § 5.1(a). The compacts incorporate the definition of "net win" used by the American Institute of Certified Public Accountants. See id. § 2.15. The payments are made according to a graduated schedule, based on the total number of gaming devices in operation. See id. § 5.1(a). No payments are required for operation of the first 200 gaming devices. See id. For the next 300 gaming devices, the tribe must make a payment to the Special Distribution Fund equivalent to 7% of the average gaming device net win. For the next 500 gaming devices, a 10% payment is required, and for any additional devices, a 13% payment is required.
*1017 The Special Distribution Fund is available for appropriations by the State legislature for
(a) grants, including any administrative costs, for programs designed to address gambling addiction; (b) grants, including any administrative costs, for the support of state and local government agencies impacted by tribal government gaming; (c) compensation for regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the implementation and administration of the Compact; (d) payment of shortfalls that may occur in the Revenue Sharing Trust Fund; and (e) other purposes specified by the Legislature.
Id. § 5.2. The compact states that the parties intend that tribes that have entered into compacts with the State will be consulted during the appropriation process, see id., but does not expressly require such consultation.

3. Tribal Labor Relations Ordinance
Finally, Coyote Valley objects to § 10.7 of the proposed compact, which renders the compact null and void unless the tribe provides the State with
an agreement or other procedure acceptable to the State for addressing organizational and representational rights of Class III Gaming Employees and other employees associated with the Tribe's Class III gaming enterprise, such as food and beverage, housekeeping, cleaning, bell and door services, and laundry employees at the Gaming Facility or any related facility, the only significant purpose of which is to facilitate patronage at the Gaming Facility.
Id. § 10.7. According to Coyote Valley, the only such agreement or procedure that is acceptable to the State is one that is identical, in all material respects, to a Tribal Labor Relations Ordinance that was developed during compact negotiations. The State asserts that the Tribal Labor Relations Ordinance is the product of negotiations between the tribes and the unions and that the ordinance imposes only minimal obligations on tribes that enact it.

B. Allowable Subject Matter for Gaming Compacts
IGRA provides that a gaming compact may include provisions relating to
(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;
(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
(v) remedies for breach of contract;
(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
(vii) any other subjects that are directly related to the operation of gaming activities.
25 U.S.C. § 2710(d)(3)(C).
The Court reads § 2710(d)(3)(C), and specifically § 2710(d)(3)(C)(vii), more broadly than Coyote Valley does. The committee report of the Senate Select Committee on Indian Affairs describes the subparts of § 2710(d)(3)(C) as "broad areas." See S.Rep. No. 100-446, at 14 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3084. Consistent with this description, the Court interprets "subjects that *1018 are directly related to the operation of gaming activities" to include any subject that is directly connected to the operation of gaming facilities.
Not all such subjects are included within § 2710(d)(3)(C)(vii), because that subpart is limited to subjects that are "directly" related to the operation of gaming activities. The committee report notes that Congress did "not intend that compacts be used as a subterfuge for imposing State jurisdiction on tribal lands." Id. The Court concludes that it was this concern that led Congress to limit the scope of § 2710(d)(3)(C)(vii) to subjects that are "directly" related to the operation of gaming activities. States cannot insist that compacts include provisions addressing subjects that are only indirectly related to the operation of gaming facilities.
Given the Court's interpretation of § 2710(d)(3)(C), Coyote Valley's argument that the challenged provisions of the proposed compact fall outside the scope of § 2710(d)(3)(C) lacks merit. The Revenue Sharing Trust Fund provisions are licensing provisions, and thus are authorized by § 2710(d)(3)(C)(vi). See S.Rep. No. 100-446 at 14, 1998 U.S.C.C.A.N. at 3085 (discussing the broad scope of subpart (vi)). The Revenue Sharing Trust Fund only applies if a tribe wants more gaming licenses than it otherwise would be entitled to under the proposed compact. The proposed compact provides a mechanism whereby a tribe can get more licenses by, in effect, using the licenses of tribes who have not, for whatever reason, engaged in gaming activities. These non-gaming tribes are compensated for the use of their licenses through the Revenue Sharing Trust Fund.
Because the Revenue Sharing Trust Fund is a licensing provision, authorized under § 2710(d)(3)(C)(vi), it is not barred by § 2710(d)(4). Furthermore, the inclusion of this licensing provision in the proposed compact cannot be considered evidence of a lack of good faith on the part of the State under § 2710(d)(7)(B)(iii)(II). Not only is the Revenue Sharing Trust Fund not direct taxation of the tribe or tribal lands, it was not a "demand" of the State. See § 2710(d)(7)(B)(iii)(II). Rather, the concept of gaming tribes paying non-gaming tribes originated in Proposition 5, which was written and supported by California tribes, and was suggested to the State by the tribes during negotiations. See Norris Decl. (filed on February 4, 2000, in support of State's Opposition) at ¶ 15.
The Special Distribution Fund is created for the purpose of covering the State's costs of overseeing gaming operations and programs addressing secondary effects of gaming operations, such as gambling addiction. Coyote Valley argues that the State may appropriate monies from the Special Distribution Fund for any purpose, because § 5.2(e) of the proposed compact allows use of such funds for "other purposes specified by the Legislature." However, the "other purposes" clause follows four other enumerated purposes for the Special Distribution Fund, each of which is directly related to gaming. Under the principle of ejusdem generis, "a general term following more specific terms means that the things embraced in the general term are of the same kind as those denoted by the specific terms." See United States v. Lacy, 119 F.3d 742, 748 (9th Cir.1997) (quotation marks and citation omitted). The Court thus construes the "other purposes" listed in § 5.2(e) of the proposed compact to be limited to other purposes that, like the first four enumerated purposes, are directly related to gaming.
The subject matter of the Special Distribution Fund is within the scope of § 2710(d)(3)(C)(iii) (compacts may include *1019 an "assessment by the State ... in such amounts as are necessary to defray the costs of regulating" gaming operations); see also California v. Cabazon Band of Mission Indians, 480 U.S. 202, 208-11, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (Cabazon Band I) (in the context of Indian law, restrictions other than those that broadly prohibit a class of conduct are "regulatory"); S.Rep. No. 100-446, at 6, 1998 U.S.C.C.A.N. at 3076 (Senate Committee expects federal courts to rely on the prohibitory/regulatory distinction discussed in Cabazon Band I). Accordingly, the Special Distribution Fund is not barred by § 2710(d)(4). Nor is the inclusion of this provision in the proposed compact evidence of a lack of good faith on the part of the State under § 2710(d)(7)(B)(iii)(II) because it is not a direct tax on the tribe or tribal lands.
Finally, labor relations at gaming facilities and closely related facilities, which is the subject governed by the Tribal Labor Relations Ordinance, is a subject that is "directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vii).

C. Preemption and Tribal Sovereignty
Coyote Valley's final argument is that the challenged provisions of the proposed compact, even if not per se prohibited as exceeding the scope of 25 U.S.C. § 2710(d)(3)(C), impose an unreasonable burden on the tribe. According to Coyote Valley, the challenged provisions cannot be justified under the balancing test discussed by the Ninth Circuit in Crow Tribe of Indians v. Montana, 650 F.2d 1104 (9th Cir.1981) (Crow Tribe I), Crow Tribe of Indians v. Montana, 819 F.2d 895 (9th Cir.1987), aff'd, 484 U.S. 997, 108 S.Ct. 685, 98 L.Ed.2d 638 (1988) (mem.) (Crow Tribe II), and Cabazon Band of Mission Indians v. Wilson, 37 F.3d 430 (9th Cir. 1994) (Cabazon Band II). Coyote Valley and amicus curiae Agua Caliente Band of Cahuilla Indians also cite a recent decision by the Tenth Circuit Court of Appeals, NLRB v. Pueblo of San Juan, 228 F.3d 1195, in support of their argument that a State cannot impose a labor relations ordinance on an unwilling tribe. Coyote Valley argues that the State's insistence on the challenged provisions is evidence of bad faith.

1. Tribal Sovereignty and the Balancing of Interests
In Crow Tribe I, the Ninth Circuit reversed the dismissal of a lawsuit brought to enjoin the application of Montana's coal mining tax to coal mining on Crow Tribe land. The court held that the Crow Tribe had "alleged facts that, if proved, would establish that the taxes are preempted [by federal law, and] infringe upon the Tribe's right to govern itself." 650 F.2d at 1107.
In Crow Tribe II, an appeal after a judgment in favor of the State on the merits in the same case, the court explained that a State law that interferes with tribal or federal interests will apply to on-reservation activities only if the State law is carefully tailored to support legitimate State interests that are substantial enough to justify the interference with tribal or federal interests. See 819 F.2d at 898-901. The court further held that, even if application of a State law is not barred based on a preemption analysis, the State law nonetheless cannot apply to on-reservation activities if such application would infringe tribal sovereignty. See id. at 902. "The principle of self-government is to seek `an accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other.'" Id. (quoting Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 156, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980)).
*1020 In Cabazon Band II, the Ninth Circuit, after balancing the federal, tribal and State interests at stake, held that a California tax on off-track betting operations could not be applied to such operations on tribal lands, where the gaming compact governing those operations did not expressly allow for such a tax. See 37 F.3d at 433-35.
In Pueblo of San Juan, the Tenth Circuit found that "the NLRA does not preempt a tribal government from the enactment and enforcement of a right-to-work tribal ordinance applicable to employees of a non-Indian company who enters into a consensual agreement with the tribe to engage in commercial activities on a reservation." 2000 WL 1410839 at *8. Coyote Valley and amicus curiae argue that this holding should be read to prohibit a State from imposing its labor relations laws or requirements on a tribe.
However, even if Pueblo of San Juan can be read to support such a proposition, it, along with Crow Tribe I, Crow Tribe II and Cabazon Band II, does not support the tribe's argument. In Crow Tribe I, Crow Tribe II and Cabazon Band II, the State restrictions at issue were unilaterally imposed by the State, and were not authorized by federal law. In the case at bar, the State cannot unilaterally impose the challenged provisions regarding assessments and labor organization on Coyote Valley, but can only propose terms for a gaming compact that will not take effect unless Coyote Valley agrees to them. Even if Coyote Valley and the State sign a compact, it cannot take effect unless approved by the Secretary of the Interior. Although, as a matter of tribal sovereignty, the State may not be able to impose taxes or labor relations requirements on a tribe absent an agreement, that is not dispositive of whether the State lacked good faith in negotiating for or even insisting on the challenged provisions in the proposed compact, which the tribes could choose to enter into.
Because no compact can take effect without the consent of federal, tribal and State representatives, no enforceable compact can run afoul of the balancing test upon which Coyote Valley relies. Moreover, the committee report states that IGRA "is intended expressly to preempt the field in the governance of gaming activities on Indian lands. Consequently, Federal courts should not balance competing Federal, State, and tribal interests to determine the extent to which various gaming activities are allowed." S.Rep. No. 100-446, at 6, 1998 U.S.C.C.A.N. at 3076. For these reasons, the Court concludes that the balancing test applicable to State attempts unilaterally to enforce restrictions on on-reservation activities does not apply to a State's proposed terms for a gaming compact.

2. Good Faith Standard
However, the substance of Coyote Valley's argument is that the challenged provisions are unreasonable. The question the Court must resolve is whether the State's negotiating position is so unreasonable that it can be said that the State has not negotiated in good faith. IGRA does not expressly define "good faith," and neither party has proposed a standard by which the Court should determine whether the State has negotiated in good faith.
The Court looks for guidance to case law interpreting the National Labor Relations Act (NLRA). Like IGRA, the NLRA imposes a duty to bargain in good faith, but does not expressly define "good faith." See 29 U.S.C. § 158(d). The Supreme Court has held that this duty "requires more than a willingness to enter upon a sterile discussion of" the parties' differences. See NLRB v. American Nat'l Ins. *1021 Co., 343 U.S. 395, 402, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). Instead, the parties must "enter into discussions with an open and fair mind and a sincere purpose to find a basis for agreement." Seattle-First Nat'l Bank v. NLRB, 638 F.2d 1221, 1227 n. 9 (9th Cir.1981) (quoting NLRB v. Holmes Tuttle Broadway Ford, Inc., 465 F.2d 717, 719 (9th Cir.1972)). The Court does not intend to import federal case law interpreting the NLRA wholesale into its interpretation of the IGRA. Obviously, the relationship of employers to unions is not analogous to that of the States to tribes. However, the Court considers the NLRA case law for guidance in interpreting a standard undefined by the IGRA.
The Court concludes that the State has negotiated with Coyote Valley in good faith. First, the State did not have to allow the tribes to engage in class III gaming at all. The Ninth Circuit has held that the State has no duty to negotiate over gaming not allowed by State law. See Rumsey, 64 F.3d at 1256. Class III gaming was illegal under California law until the State constitution was amended to grant compacted tribes the exclusive right to engage in it. Such gaming is still illegal in California for everyone but compacted tribes.
Second, the challenged provisions are the result of tribal-State and tribal-union negotiations, not unilateral demands by the State. The Tribal Labor Relations Ordinance is the product of negotiations between the tribes and union representatives. See Harvey Decl. (filed on February 2, 2000 in support of State's Opposition) at ¶¶ 4-5. In deference to the sovereignty concerns of several tribes, the State agreed to the tribes' request not to place the labor provisions directly in the compact. See id. at ¶ 5. The Tribal Labor Relations Ordinance provides for relatively minimal organizational rights such as the right to engage in collective bargaining if the union becomes the exclusive collective bargaining representative by winning an election. See id. at ¶ 6; id., Exh. A. Among other provisions beneficial to the tribes, the Tribal Labor Relations Ordinance prohibits unions from interfering with a Tribal Gaming Commission's regulation of its gaming operations, allows for employment preferences for Native Americans, limits a union's right to strike, and prohibits strike-related pickets on tribal land. See id. at ¶ 7; id., Exh. A. As noted above, the Revenue Sharing Trust Fund had its origins in Proposition 5, which was written and supported by California tribes, and was suggested to the State by the tribes during negotiations. See Norris Decl. at ¶ 15.
Third, in response to the State's proposed compact, Coyote Valley counter-offered with a modified compact that, among other things, deleted the challenged provisions entirely, while retainingand, in fact, enlargingother aspects of the proposed compact favorable to it. See Chang Dec., Ex. I (red-lined comparison between the State's proposed compact and Coyote Valley's counter-offer). That is, Coyote Valley took the position that the compact should not address at all the subjects encompassed by the challenged provisions. As explained above, Coyote Valley's position that the challenged provisions address subjects outside the permissible scope of gaming compacts is incorrect. The State thus did not act in bad faith by refusing to accept the tribe's counter-offer.
Finally, although the State has indicated a willingness to negotiate further over the challenged provisions, see id., Ex. J at 3 (Dec. 3, 1999 letter), Coyote Valley apparently has not contacted the State to arrange any further negotiations. See id., Ex. K; Norris Dec. ¶ 24. Having declined to engage in further negotiations over the *1022 challenged provisions, Coyote Valley cannot reasonably assert that the State's failure to alter those terms constitutes a refusal to negotiate in good faith.
In summary, the Court concludes that Coyote Valley has thus far chosen to limit its negotiations with the State with regard to the challenged provisions to the issue of whether the provisions are per se unreasonable, based on its position that these provisions address subjects not allowable in a gaming compact. The Court further concludes that Coyote Valley's position is incorrect. Because Coyote Valley's only counter-offer to the proposed compact is premised on this legally incorrect position, the State did not act in bad faith by refusing to accept the counter-offer. In the context of the totality of the negotiations and the resultant compact proposed by the State, the Court concludes that the State negotiated in good faith with Coyote Valley.

CONCLUSION
For the foregoing reasons, the Court DENIES Coyote Valley's motion for an order requiring the State to negotiate with Coyote Valley pursuant to 25 U.S.C. § 2710(d)(7)(B)(iii) and (iv) (Docket No. 51). Judgment shall enter accordingly. The Clerk shall close the file.
IT IS SO ORDERED.
NOTES
[1] Specifically, IGRA provides:

(i) An Indian tribe may initiate a cause of action [to compel the State to negotiate in good faith] only after the close of the 180-day period beginning on the date on which the Indian tribe requested the State to enter into negotiations under paragraph (3)(A).
(ii) In any action [by an Indian tribe to compel the State to negotiate in good faith], upon the introduction of evidence by an Indian tribe that
(I) a Tribal-State compact has not been entered into under paragraph (3), and
(II) the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith,
the burden of proof shall be upon the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities.
Id. § 2710(d)(7)(B).
[2] Coyote Valley does reserve the right to challenge this limit in future negotiations with the State.