**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PAUMA BAND OF LUISENO MISSION
INDIANS OF THE PAUMA & YUIMA
RESERVATION, AKA Pauma Band of
Mission Indians, AKA Pauma
Luiseno Band of Mission Indians,
    *Plaintiff-Appellant*,

v.

STATE OF CALIFORNIA; GAVIN
NEWSOM[*], as Governor of the State
of California,
    *Defendants-Appellees*,

and

CALIFORNIA GAMBLING CONTROL
COMMISSION, an agency of the State
of California; Attorney General for
the State of California,
    *Defendants*.

No. 18-56457

D.C. No.
3:16-cv-01713-
BAS-JMA

OPINION

---

[*] Gavin Newsom, the Governor of the State of California, is substituted for Edmund G. Brown Jr. *See* Fed. R. App. P. 43(c)(2).

Appeal from the United States District Court
for the Southern District of California
Cynthia A. Bashant, District Judge, Presiding

Submitted July 6, 2020[**]
Pasadena, California

Filed September 2, 2020

Before:  Carlos T. Bea and Bridget S. Bade, Circuit Judges,
and Yvonne Gonzalez Rogers,[***] District Judge.

Opinion by Judge Bade

## SUMMARY[****]

### Indian Gaming Regulatory Act

The panel affirmed the district court's partial grant of
summary judgment in favor of the State of California and the
Governor of the State of California, defendants in an action
arising from negotiations for a new tribal-state compact
between the State and the Pauma Band of Luiseno Mission

---

[**] The panel unanimously concludes this case is suitable for decision
without oral argument.  *See* Fed. R. App. P. 34(a)(2).

[***] The Honorable Yvonne Gonzalez Rogers, United States District
Judge for the Northern District of California, sitting by designation.

[****] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

Indians of the Pauma and Yuima Reservation for class III gaming under the Indian Gaming Regulatory Act.

The panel agreed with the district court that the State satisfied its obligation to negotiate in good faith under IGRA because the State agreed to negotiate for the new types of class III gaming that Pauma sought authorization to offer at its casino, actively engaged in the negotiations, and remained willing to continue the negotiations when Pauma filed this litigation.

## COUNSEL

Cheryl A. Williams and Kevin M. Cochrane, Williams & Cochrane LLP, Temecula, California, for Plaintiff-Appellant.

Xavier Becerra, Attorney General; Sara J. Drake, Senior Assistant Attorney General; T. Michelle Laird, Supervising Deputy Attorney General; Paras Hrishikesh Modha, Deputy Attorney General; Timothy M. Muscat, Deputy Attorney General; Office of the Attorney General, Sacramento, California; for Defendants-Appellees.

## OPINION

BADE, Circuit Judge:

This action arose from negotiations for a new tribal-state compact between Plaintiff-Appellant Pauma Band of Luiseno Mission Indians of the Pauma and Yuima Reservation ("Pauma") and Defendants-Appellees the State of California and the Governor of the State of California

(collectively, the "State").  In a well-reasoned decision, the district court held that the State satisfied its obligation to negotiate in good faith under the Indian Gaming Regulatory Act ("IGRA") and entered judgment in favor of the State on twenty of Pauma's twenty-two claims.  We agree with the district court that the State agreed to negotiate for the new types of class III gaming that Pauma sought authorization to offer, actively engaged in the negotiations, and remained willing to continue the negotiations when Pauma filed this litigation.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

# I

IGRA "strike[s] a delicate balance between the sovereignty of states and federally recognized Native American tribes" with respect to gaming on tribal land. *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California* ("*Pauma*"), 813 F.3d 1155, 1160 (9th Cir. 2015); *see Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 (2014).  IGRA separates tribal gaming into three general "classes," each with progressively restrictive regulations.  *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 48 (1996).  Class III gaming "includes the types of high-stakes games usually associated with Nevada-style gambling," *Coyote Valley Band of Pomo Indians v. California* (*In re Gaming Related Cases*) ("*Coyote Valley*"), 331 F.3d 1094, 1097 (9th Cir. 2003), and "is subjected to the greatest degree of control under IGRA's regulations," *Pauma*, 813 F.3d at 1160.  A tribe may offer class III gaming only pursuant to a tribal-state compact—an agreement between the tribe and state authorizing and governing gaming activities.  *See* 25 U.S.C. § 2710(d); *Rumsey Indian Rancheria of Wintun Indians v. Wilson* ("*Rumsey*"), 64 F.3d 1250, 1256 (9th Cir. 1994).

When a state receives a tribe's request to negotiate a compact to permit class III gaming, it "shall negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A).  Although IGRA does not define "good faith," it provides that courts "may" consider "the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities" when evaluating whether a state negotiated in good faith and "shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence" of bad faith.  *Id.* § 2710(d)(7)(B)(iii).  A compact may include "provisions relating to" various terms, including application of criminal and civil laws, allocation of criminal and civil jurisdiction, assessments, taxation, remedies, and operational standards.  *Id.* § 2710(d)(3)(C)(i)–(vii).

We analyze bad faith claims under IGRA's burden-shifting standard.  The tribe bears the initial burden of "introduc[ing] . . . evidence" that:  (1) "a Tribal-State compact has not been entered into" and (2) the state either failed to respond to the tribe's request "in good faith" or failed to respond altogether.  *Id.* § 2710(d)(7)(B)(ii)(I)–(II).  If that evidentiary showing is made, the burden shifts to the state to establish that it "negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities."  *Id.* § 2710(d)(7)(B)(ii).

If a state fails to negotiate in good faith, IGRA affords a multi-step judicial remedy.  First, the court must order the state and tribe to approve "a compact within a 60-day period."  *Id.* § 2710(d)(7)(B)(iii).  Second, if those negotiations are unsuccessful, the parties shall "submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact," and the

mediator must select the proposal that "best comports with the terms" of IGRA.  *Id.* § 2710(d)(7)(B)(iv).  In the third and final step, "[i]f the State does not accept the mediator's chosen compact within 60 days, the Secretary of the Interior shall prescribe, consistent with the mediator's chosen compact and with the terms of IGRA, the conditions upon which the tribe may engage in class III gaming."  *Coyote Valley*, 331 F.3d at 1098 (citing 25 U.S.C. § 2710(d)(7)(B)(vii)).

"[T]he function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis, not to embroil the parties in litigation over their subjective motivations."  *Rincon Band of Luiseno Mission Indians v. Schwarzenegger* ("*Rincon*"), 602 F.3d 1019, 1041 (9th Cir. 2010).  As a result, we evaluate good faith "objectively based on the record of negotiations."  *Id.*; *see also Coyote Valley*, 331 F.3d at 1113 ("[T]he good faith inquiry is nuanced and fact-specific, and is not amenable to bright-line rules.").

We have indicated that a state is not guilty of procedural bad faith if it "remained willing to meet with the tribe for further discussions."  *Coyote Valley*, 331 F.3d at 1110.  Similarly, a state does not engage in bad faith simply because "it takes a 'hard line' negotiating position" with a tribe. *Rincon*, 602 F.3d at 1038.  "[A] 'hard line' stance is not inappropriate so long as the conditions insisted upon are related to legitimate state interests regarding gaming and the purposes of IGRA."  *Id.* at 1039 (emphasis omitted).

# II

## A

The California Constitution generally prohibits lotteries. Section 19(a) provides:  "The Legislature has no power to authorize lotteries, and shall prohibit the sale of lottery tickets in the State."  Cal. Const. art. IV, § 19(a); *see* Cal. Penal Code §§ 320–326.  Nonetheless, the California Constitution authorizes "the establishment of a California State Lottery."  *Id.* § 19(d).

The corresponding Lottery Act creates the California State Lottery, which is limited to operating "lottery games." Lottery game "means any procedure authorized by the [State Lottery Commission] whereby prizes are distributed among persons who have paid, or who have unconditionally agreed to pay, for tickets or shares which provide the opportunity to win those prizes." Cal. Gov't Code § 8880.12.  "The Lottery Act's only express limitations on the types of lottery games the commission may authorize are contained in [California] Government Code section 8880.28." *W. Telcon, Inc. v. Cal. State Lottery*, 917 P.2d 651, 654 (Cal. 1996).  These limitations include that "[n]o lottery game may use the theme of roulette, dice, baccarat, blackjack, Lucky 7s, draw poker, slot machines, or dog racing," and that "[i]n games utilizing computer terminals or other devices, no coins or currency shall be dispensed as prizes to players from these computer terminals or devices."  Cal. Gov't Code § 8880.28(a)(1), (3).

In March 2000, the voters of California amended the California Constitution to authorize Indian tribes to operate three forms of class III gaming in reservation casinos:  slot machines, banking and percentage card games, and lottery games.  As amended, the California Constitution provides:

> [T]he Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law.    Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts.

Cal. Const. art. IV, § 19(f).

## B

In May 2000, Pauma and the State executed what is commonly known as the 1999 Compact, a nine-page document prescribing, *inter alia*, the types of class III gaming that Pauma could offer.  As one type of class III gaming, Section 4.1(c) of the 1999 Compact authorized Pauma to operate "any devices or games that are authorized under state law to the California State Lottery, provided that the Tribe will not offer such games through use of the Internet unless others in the state are permitted to do so under state and federal law."

In 2004, Pauma and the State negotiated an amendment to the 1999 Compact authorizing Pauma to operate more machines in exchange for higher fees to the State.  *See Pauma*, 813 F.3d at 1161–62.  Lengthy litigation ensued, and in 2015, this court affirmed the district court's judgment rescinding the amendment and awarding $36.2 million to Pauma.  *See id.* at 1173.  With the 2004 amendment

rescinded, the 1999 Compact became the sole operative agreement governing Pauma's gaming activities.

In November 2014, Pauma notified the State that it wanted to renegotiate the 1999 Compact pursuant to Section 12.2 of the 1999 Compact and the then-enforceable 2004 amendment.  In its letter, Pauma identified two new types of class III gaming that it sought authorization to offer: (1) on-track horse racing and wagering and (2) an expanded set of lottery games.  Specifically, Pauma wanted to "supplement the lottery games it offers by obtaining the right to conduct any games that are *not* currently authorized under State law to the California State Lottery."  The State agreed to negotiate for the two new types of gaming, and the parties arranged an in-person meeting to discuss the scope of the negotiations.

The parties met for the first time in January 2015. Although they did not record the meeting, the parties exchanged letters—spanning from early to mid-2015— memorializing the meeting.  The parties disputed some details of the meeting but agreed that Pauma expressed no interest in the State's suggestion that Pauma add off-track wagering to its plans.  The parties also agreed that Pauma declined to furnish details about its plans for an on-track facility.

The parties anticipated meeting a second time in May 2015, but Pauma asked that the meeting be delayed so its attorneys could prepare for oral argument in the parties' other litigation.  The State agreed, and the parties scheduled a second meeting in early September 2015.  This meeting was recorded, and the parties included a transcript in the joint record of negotiations.

The transcript of the second meeting shows that the Executive Director of the California Horse Racing Board attended, at the State's request, to lend insight into the nuances of on-track horse racing and wagering.  The Executive Director provided general background information about on-track horse racing, answered general questions from Pauma about various state regulations, and advised Pauma that a new track had not been built in California for approximately sixty years.  The Executive Director advised Pauma that an on-track facility would be "very well received" because the industry was "declining" and tracks were "closing."

The record also shows that the State reiterated its request that Pauma supply specific details about the two new types of class III gaming it sought and to propose compact language.  The State explained that, in its negotiations with other tribes, the parties usually circulated written proposals, which allowed for interim analysis and written responses.  After some initial hesitancy, Pauma stated that it had "no problem drafting the language" and would get its proposed language to the State "quick."

The State also inquired if it could review Pauma's "business plan" for the on-track racing facility to understand the scope of the operation.  Pauma declined, explaining that it wanted to discuss whether to disclose the plan and that it was "reluctant" to share detailed information with the State. Pauma's attorneys noted that they were "newbies" in horse racing and disputed the State's position that Pauma should first identify what it "had in mind" for an on-track facility. Pauma also changed its mind and agreed with the State's recommendation to offer off-track wagering.

A new dispute emerged during the second meeting over the scope of the negotiations.  The State understood that the

negotiations were limited to the two new types of gaming identified in Pauma's November 2014 letter (i.e., on-track horse racing and additional lottery games), while Pauma believed that the entire 1999 Compact was on the table. Throughout the fall of 2015, the parties exchanged correspondence addressing the scope of the negotiations. And in November 2015, Pauma triggered the 1999 Compact's dispute resolution process.

During this time, the State contacted the National Indian Gaming Commission to inquire about on-track horse racing and wagering compacts across the country. The State learned that such compacts were "rare" but obtained a compact addendum that had been approved by the Secretary of the Interior. In November 2015, the State sent Pauma that compact addendum, titled "Pari-Mutuel Racing Addendum to Gaming Compact Between the Sisseton-Wahpeton Sioux Tribe and the State of North Dakota." Around the same time, the State circulated a draft off-track wagering addendum that would authorize Pauma to develop a satellite wagering facility.

Because of their continuing rift about the scope of the negotiations, the parties met for an in-person dispute resolution in December 2015. Soon after the meeting, the State sent a letter to Pauma reaffirming its position on the scope of the negotiations but, in an effort to move negotiations forward, agreeing to negotiate for a new or amended compact pursuant to Section 12.1. In January 2016, the State confirmed its agreement to renegotiate the 1999 Compact in full and told Pauma that it "look[ed] forward" to receiving a draft compact from Pauma as well as Pauma's "plans for on-track betting."

Rather than propose a draft compact or disclose any information about the on-track facility, Pauma changed tack.

In late January 2016, Pauma notified the State that it wanted to separately negotiate each item of the compact so the parties could "seek court guidance" along the way.  To commence the new approach, Pauma proposed modifications to the 1999 Compact's lottery game language.

The State responded in March 2016.  Citing negotiating efficiency, limitations on the negotiation process, and lack of a legal basis in IGRA, the State rejected Pauma's piecemeal negotiation approach.  The State also rebuffed Pauma's lottery game language and advised that although it understood its authority to negotiate lottery games to be limited to those games offered by the California State Lottery (the "Lottery"), it would negotiate for games beyond that scope if the compact enumerated the games.  Identifying the games, according to the State, would clarify the scope of the authorization, avoid future disputes, and reduce the risk of violating lottery regulations.  Finally, because Pauma failed to do so, the State advised that it would send a "complete draft compact to guide our future discussions."

In April 2016, the State circulated a "draft compact," titled "Pauma State's Draft Proposed Compact," for Pauma's "consideration" and asked Pauma to "let us know when you would like to discuss."  The lengthy draft (approximately 140 pages) addressed a broad array of topics and included comments in the margins to highlight certain issues requiring further negotiation.  For example, one comment noted that the State remained "open, as indicated in prior correspondence, to discussion regarding the authorization of additional enumerated games."  In another, the State wrote that it "has proposed OTW [off-track wagering] compact that can be incorporated as an Appendix or negotiated and concluded as a separate class III gaming compact."

Pauma never responded. Instead, it filed this lawsuit a few months later. On cross-motions for summary judgment, the district court held that the State negotiated in good faith, and it entered judgment in favor of the State on twenty of Pauma's claims under Federal Rule of Civil Procedure 54(b). Pauma appeals.

## III

We review de novo an order on cross-motions for summary judgment and evaluate "each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006) (internal quotation marks omitted). Summary judgment is appropriate if, after viewing the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists. *Frudden v. Pilling*, 877 F.3d 821, 828 (9th Cir. 2017). We review de novo whether a state negotiated for a tribal-state compact in good faith. *Rincon*, 602 F.3d at 1026 (citing *Coyote Valley*, 331 F.3d at 1107).

## IV

The crux of this appeal is Pauma's belief that the State stalled during negotiations and proposed a woefully inadequate draft compact. Before analyzing the claims, however, we first address Pauma's argument that the district court improperly created an "impasse" defense to bad faith claims. In its decision, the district court observed that "all of Pauma's claims encounter the same problem" and "appear premature" because the negotiations had not "reached an impasse." But the district court did not base its decision on whether the negotiations were at an impasse. Rather, it proceeded to analyze the record of negotiations for each individual claim and reinforced its conclusion that the State

negotiated in good faith by underscoring that the State remained willing to continue meeting and negotiating with Pauma.  The state of negotiations at the commencement of a lawsuit is certainly a relevant factor for courts to consider when analyzing bad faith claims under IGRA, *see Coyote Valley*, 331 F.3d at 1109–10, and the district court did not err in doing so here.

## A

In Count 1, Pauma alleges that the State engaged in a procedural form of bad faith:  surface bargaining.  According to Pauma, the State evaded real negotiations for lottery games by chronically feigning ignorance of Pauma's requests.

The record belies Pauma's characterization.  To avoid future litigation, the State repeatedly asked Pauma to describe the scope of the additional lottery games that it sought to offer, to clearly describe those games, and to submit draft compact language.  Although Pauma finally advanced lottery game language in January 2016, it simultaneously altered the format of the negotiations by proposing—for the first time—that the parties negotiate each part of the compact separately.  The State declined to negotiate in a piecemeal manner and rejected Pauma's proposed language.  The State agreed, however, to negotiate for lottery games beyond those authorized for the California State Lottery if the compact enumerated the games.  The State then circulated a draft compact highlighting that topic for further negotiation, but Pauma never responded.

We agree with the district court that no genuine dispute exists on whether the State engaged in bad faith by surface bargaining.  "Lottery game" is a statutorily defined term with subtle parameters.  *See* Cal. Gov't Code §§ 8880.12,

8880.28(a)(1), (3); *W. Telcon, Inc.*, 917 P.2d at 658–63 (holding that the "CSL Keno" game operated by the Lottery was a "house-banked game" and therefore an unlawful activity because it did not meet the definitions of "lottery game" under California Government Code § 8880.12 or "lottery" under California Penal Code § 319). It was not bad faith for the State to request specific language to prevent inadvertent approval of unlawful lottery games. Again, because Pauma failed to respond to the State's position, the parties did not further explore each other's views on this issue. We abstain from inserting ourselves into incomplete negotiations. *See Coyote Valley*, 331 F.3d at 1110 (concluding that state did not negotiate in procedural bad faith because it "remained willing to meet with the tribe for further discussions").[1]

Pauma compares this case to *Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024 (2d Cir. 1990). But unlike the State of California here, the State of Connecticut there did not meet with the tribe in person, contact outside experts, circulate model compact addendums, or propose a draft compact. To the contrary, the State of Connecticut acted in bad faith by falsely promising that it would "appoint[] a task force or negotiating team." *Mashantucket Pequot Tribe*, 913 F.2d at 1024, 1027–28; *see also Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1056 (9th Cir. 1997) ("We agree that Congress, in passing IGRA, did not create a mechanism whereby states can make empty promises to Indian tribes during good-faith negotiations of Tribal-State compacts . . . ."). Thus, Pauma's reliance on

---

[1] This is not to say that a state can never engage in bad faith by surface bargaining. But under the objective circumstances of this case, the State did not do so here.

*Mashantucket Pequot Tribe* is misplaced; the record here reflects extensive efforts by the State, not empty promises.

## B

In Count 2, Pauma alleges that the State negotiated in bad faith by taking actions designed to protect the Lottery's revenues.  In support, Pauma directs us to a single comment from one in-person meeting, when the State's representative noted that the monies earned by the Lottery support childhood education in California.  But that statement was merely a factual response to Pauma's impromptu spurring of the issue.  The State confirmed that it was not engaging in protectionism, and it agreed to negotiate for new lottery games beyond those offered by the Lottery.  As the district court observed, "[i]f agreeing to negotiate to allow Pauma to offer new games beyond [those] conducted by the California State Lottery is part of the State's protectionist strategy, it is a poor one."

## C

Pauma alleges in Count 3 that the State negotiated in bad faith regarding Pauma's request to offer on-track horse racing and wagering because the State refused to discuss on-track horse wagering during the second meeting, declined to negotiate the terms of a new compact piecemeal, and circulated a draft compact.  The record, which we consider as a whole, *see Rincon*, 602 F.3d at 1041, fails to support this claim.

The record shows that although the State had never previously negotiated over this form of gaming, it repeatedly expressed its willingness to do so with Pauma.  To that end, the State asked Pauma during the first meeting to supply details about its envisioned on-track facility.  Pauma refused.

During the second meeting, the State again asked Pauma for more details about its facility, including the business plan Pauma had developed. Pauma refused. After the second meeting, the State repeated its request for clear and specific information regarding the on-track facility. Still, Pauma disclosed nothing. Meanwhile, the State brought the Executive Director of the California Horse Racing Board to the second meeting, obtained a sample addendum for on-track racing from the National Indian Gaming Commission, and circulated a draft compact addendum for a satellite off-track wagering facility.

The State actively participated in the negotiations and tried to advance the negotiations. True, the State was reluctant to finalize compact language during the second meeting, but it encouraged Pauma to circulate draft language so it could analyze the information and respond in writing. The record is replete with examples of the State's fruitless requests that Pauma provide specific details about its envisioned on-track facility. Moreover, Pauma filed this action without ever commenting on the State's sample compact from North Dakota, its draft off-track wagering addendum, or its draft compact. A state's duty to negotiate in good faith does not compel blind negotiation, and nothing in the record shows that the State negotiated in bad faith over on-track horse racing and wagering.[2]

---

[2] To the extent Pauma claims that the State engaged in bad faith by declining to separately negotiate each compact term, we reject the claim. Pauma cites no binding authority requiring a state to negotiate a compact line-by-line or consent to a tribe's favored negotiation format.

# D

In Counts 4 through 8, Pauma claims that the State acted in bad faith by refusing to negotiate for specific types of additional lottery games:  (a) those games not authorized for the Lottery (Count 4), (b) video lottery terminals (Count 5), (c) video lottery terminals that dispense coins or currency (Count 6), (d) games based on a tribal lottery system (Count 7), and (e) games authorized to the Multi-State Lottery Association or any other state (Count 8).  And in Count 9, Pauma asserts that the State violated its good faith duties by failing to substantiate its position for additional lottery games.

We agree with the district court that summary judgment is proper on Counts 4 through 8 because the State agreed to negotiate for additional lottery games, including games not authorized for the Lottery, and reasonably requested that such games be enumerated in the compact.  Pauma argues that the State should have permitted it to offer all lottery games beyond the Lottery's authorization.  But this misses the point and ignores Pauma's failure to respond to the State's position.  Although the State indicated concern that its authority to negotiate extended only to those games authorized for the Lottery, it agreed to negotiate for games beyond that limit if the compact listed the games.  Pauma spurned this channel of negotiation by failing to respond.  Before litigating the substance of the State's bargaining position, Pauma needed to at least raise its objections with the State.[3]

---

[3] Pauma's comparison of this case to *Northern Arapaho Tribe v. Wyoming*, 389 F.3d 1308 (10th Cir. 2004), is not persuasive.  Unlike the State of Wyoming's refusal to negotiate for games beyond the bounds of

The district court also properly entered summary judgment on Count 9, Pauma's claim that the State failed to substantiate its negotiating position. The record establishes that the State substantiated its request to enumerate the games in the compact by identifying various interests, including clarifying the scope of the authorization, avoiding future disputes, and mitigating the risk of violating regulations. But even if the State had not provided these reasons, Pauma cites no authority that failing to substantiate a bargaining position constitutes bad faith under IGRA.**[4]** So long as the bargaining position itself does not violate IGRA, the obligation to negotiate in good faith does not require states, in every circumstance, to furnish specific reasons for every position taken during negotiations.

## E

In Count 10, Pauma alleges that the State acted in bad faith by refusing to renegotiate the 1999 Compact in full and by conflating "amendment" under Section 12.1 with

_____

state law, *see N. Arapaho Tribe*, 389 F.3d at 1312–13, the State of California did not tether its position on the lottery game issue to its understanding of California law. Indeed, despite its understanding of its authority under California law, the State of California agreed to negotiate for games beyond those authorized for the Lottery.

**[4]** Pauma cites *National Labor Relations Board v. Truitt Manufacturing Co.*, 351 U.S. 149, 152–53 (1956), to support its claim that the State needed to substantiate its position. But that case did not involve IGRA, and the Court expressly declined to hold that "substantiating evidence" for a bargaining position is required "in every case." *Nat'l Labor Relations Bd.*, 351 U.S. at 153. The Court instead explained that "[e]ach case must turn upon its particular facts" and "[t]he inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." *Id.* at 153–54.

"renegotiation" under Section 12.2.[5]  According to Pauma, the State manipulated the distinction between mandatory renegotiation under Section 12.2 and voluntary amendment under Section 12.1 in an attempt to obtain improper benefits and to forego discussion of additional gaming rights.

We disagree.  The State agreed to renegotiate the entirety of the 1999 Compact just two months after Pauma raised the issue in September 2015.  And even during the dispute over the scope of the negotiations, the State continued to engage Pauma on its requests for new gaming rights.  Any minor delay the State caused by believing that the negotiations were limited to the two games identified in Pauma's original letter does not establish bad faith.  *See Coyote Valley Band of Pomo Indians v. California* (*In re Indian Gaming Related Cases*), 147 F. Supp. 2d 1011, 1015 (N.D. Cal. 2001), *aff'd*, 331 F.3d 1094 (9th Cir. 2003).

Pauma's reliance on *Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095 (9th Cir. 2006), does not salvage this claim. There, the State of Idaho argued that the parties needed to renegotiate an entire compact to reach a "necessary amendment," despite the compact separately defining "amendment" and "renegotiation."  *See Shoshone-Bannock Tribes*, 465 F.3d at 1099.  In contrast, the State of California agreed to do what Pauma wanted:  renegotiate the entire 1999 Compact, including for the two new types of class III gaming.  And unlike the State of Idaho, the State of California did not demand additional payments in exchange

---

[5] Section 12.1 provides that "[t]he terms and conditions of this Gaming Compact may be amended at any time by the mutual and written agreement of both parties."  Section 12.2 provides that "[t]his Gaming Compact is subject to renegotiation in the event the Tribe wishes to engage in forms of Class III gaming other than those games authorized herein and requests renegotiation for that purpose . . . ."

for authorization to offer the new types of gaming, *see id.* at 1101–02, nor did it manipulate the terms of the compact to advance a self-serving agenda.

**F**

The final ten claims are based on the State's April 2016 draft compact proposal. Pauma alleges in Count 11 that the State failed to afford individualized negotiations because the draft was similar to a compact the State executed with another tribe. But the State made clear that its proposal was only the next step in the negotiations. The State previously told Pauma that circulating written drafts was routine in compact negotiations and encouraged Pauma to propose a first draft. Pauma never did. The State's decision to circulate a proposed draft compact for future discussions does not evidence bad faith; instead it demonstrates a proper motivation: the State endeavored to move the negotiations toward the finish line. *See Mashantucket Pequot Tribe*, 913 F.2d at 1033 ("[T]he manifest purpose of [IGRA] is to move negotiations toward a resolution . . . .").[6]

In Counts 12 through 20, Pauma alleges that the State negotiated in bad faith by including "unduly harsh" language in the draft compact. These claims are subject to summary judgment for the same reason as Count 11: the draft compact was just that, a draft. The State openly identified areas that needed further negotiation and, before sending the draft, advised Pauma that the document was meant to guide future discussions. The State did not throw in the towel as Pauma

---

[6] We reject Pauma's attempt to construe this first proposed draft as the State's final offer. The letter circulating the draft compact and the draft itself clearly establish that the document was a draft, not a take-it-or-leave-it offer.

insists—it was Pauma that refused to engage with the State any further.  We will not probe the details of a nearly 140-page draft compact that Pauma never discussed with the State.

## V

The record shows that the State participated in multiple in-person meetings with Pauma and agreed to negotiate for the additional types of class III gaming.  The State consulted with multiple experts, obtained and disclosed a sample on-track compact, and proposed a full draft compact to guide the parties' future discussions.  Because the State "remained willing to meet with the tribe for further discussions" and "actively negotiated," the district court properly granted the State's motion, denied Pauma's motion, and entered judgment for the State.  *See Coyote Valley*, 331 F.3d at 1110.

**AFFIRMED.**